1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF MICHIGAN
2              SOUTHERN DIVISION

3                 —   —   —

UNITED STATES OF AMERICA,
4
              Plaintiff,
5                                    Case No. 20-20599
   v.
6                                    Hon. Matthew F. Leitman
CORY JUSTIN MANN and RACHEL
7  LOCRICCHIO,

8              Defendants.
   _____/
9

10                 MOTION HEARING

11     BEFORE THE HONORABLE MATTHEW F. LEITMAN
            United States District Judge
12      Theodore Levin United States Courthouse
            231 West Lafayette Boulevard
13               Detroit, Michigan
            Wednesday, May 15, 2024
14

15  APPEARANCES:

16  For the Plaintiff:    MARK S. MCDONALD
                          CHRISTOPHER O'DONNELL
17                        U.S. DEPARTMENT OF JUSTICE, TAX DIV.
                          P.O. Box 972, Ben Franklin Station
18                        Washington, DC  20044
                          (202) 514-5150
19

20

21

22

23

24      *To obtain a copy of this official transcript, contact:*
            *Robert L. Smith, Official Court Reporter*
25      *(313) 234-2612 • robert_smith@mied.uscourts.gov*

```
 1   APPEARANCES:   (Continued)

 2   For the Defendant        ERIC NEMETH
     Cory Justin Mann:        WILLIAM L. THOMPSON
 3                            VARNUM, LLP
                              480 Pierce Street, Suite 300
 4                            Birmingham, MI 48009
                              (313) 481-7318
 5

 6   For the Defendant
     Rachel Locricchio:       ALLISON L. KRIGER
 7                            HANNAH ROSE BARON
                              LA RENE & KRIGER, P.L.C.
 8                            645 Griswold, Suite 171
                              Detroit, MI 48221
 9                            (313) 967-0100

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           TABLE OF CONTENTS

2    MATTER                                                        PAGE

3    ECF No. 578 DEFENDANTS' MOTION TO DISMISS
                    Discussion with Mr. McDonald................ 5
4                   Discussion with Mr. Nemeth..................67
                    Discussion with Ms. Kriger..................85
5                   Discussion with Mr. McDonald................88
                    Ruling by the Court.........................93
6

7

8

9

10

11
     EXHIBITS:                              Offered      Received
12

13    (No exhibits offered)

14

15

16

17

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Wednesday, May 15, 2024

3    at about 9:29 a.m.

4                              _   _   _

5              (Court, Counsel and Defendants present.)

6              THE CASE MANAGER:  All rise.

7              The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Matthew F. Leitman, United States District Judge, presiding.

10              You may be seated.

11              The Court calls Case No. 20-2 0599, United States

12    of America v. Cory Mann and Rachel Locricchio.

13              Counsel, please state your appearances for the

14    record.

15              MR. McDONALD:  Good morning, Your Honor.

16    Mark McDonald here on behalf of the government.

17              MR. O'DONNELL:  Good morning, Your Honor.

18    Christopher O'Donnell on behalf of the government.

19              THE COURT:  Good morning.  Welcome to you two.

20              MR. NEMETH:  Good morning, Your Honor.  Eric Nemeth

21    on behalf of the defendant, Cory Mann, who is seated right

22    behind me.

23              MR. THOMPSON:  Good morning, Your Honor.

24    William Thompson also on behalf of Defendant Cory Mann.

25              THE COURT:  Good morning.

1              MR. THOMPSON:  Good morning.

2              MS. BARON:  Good morning, Judge.  Hanna Baron

3    representing Ms. Locricchio.

4              MS. KRIGER:  Good morning, Your Honor.

5    Allison Kriger on behalf of Ms. Locricchio, who's beside me.

6              THE COURT:  Okay.  Welcome to you all.  Please be

7    seated.

8              Okay.  We are here this morning for a hearing on

9    motions; there's a number that are up today.  I'd like to

10   start with the motion that the defendants filed to dismiss

11   the indictment, it's Docket No. 578.  The defendants had the

12   last word on that with a reply brief that was filed

13   yesterday, and I had a chance to read that.

14             So what I'd like to do is begin with some questions

15   for the government, if I could.  Who will be arguing this

16   motion for the government?

17             MR. McDONALD:  I will, Your Honor.

18             THE COURT:  All right.  Do you mind coming to the

19   podium?

20             All right.  Mr. McDonald, you and I have had

21   cases -- these cases together for a long time, so you know I

22   kind of like to start with my questions, and then I'd be

23   pleased to hear any additional argument that the parties

24   have, after I ask my questions.

25             So my questions are going to kind of bounce around.

1   I wish I could tell you that I organized them in some sort of

2   a brilliant fashion, but unfortunately, I haven't, so if the

3   organization or something confuses, you just let me know.

4           MR. McDONALD: Yes, sir.

5           THE COURT: All right. So let me start with just

6   some basic questions to help me get my head around the

7   procedure for an investigation.

8           So some of the documents that are attached to the

9   motion are forms that I think are called FBI 302 forms, and a

10   form that is -- that goes by the letters MOI, memorandum of

11   investigation.

12           Are those documents that agents prepare when they

13   have contact with a witness in a case, is that what those

14   are?

15           MR. McDONALD: Yes, sir.

16           THE COURT: All right. And is the idea here, that

17   when an agent has contact with a witness in a case, for

18   instance, the agents working on this case in connection with

19   you guys, the idea is they're supposed to generate either

20   a 302 or an MOI; is that the idea?

21           MR. McDONALD: Generally, yes, sir.

22           THE COURT: Is there some exception to that?

23           MR. McDONALD: Yes, sir.

24           THE COURT: What's the exception?

25           MR. McDONALD: For doing trial prep and there's

1   nothing new, then there's not one.

2      THE COURT:  But apart from trial prep with

3   reviewing old materials, it's fair to operate on the premise

4   that if an agent working on your team has contact with a

5   witness and there's communication about the case, the agent

6   will generate either a 302 or an MOI?

7      MR. McDONALD:  Yes, sir.

8      THE COURT:  And is the idea here that the 302 or

9   the MOI is supposed to memorialize the statements made by the

10  witness to the agent working on your team?

11     MR. McDONALD:  It is a summary or a memorialization

12  of the statements, yes.

13     THE COURT:  All right.  And is it fair to say

14  the 302 or the MOI is supposed to capture the material or

15  important statements that the witness makes?

16     MR. McDONALD:  Yes, Your Honor.

17     THE COURT:  And is it fair to say that the 302 or

18  the MOI is supposed to capture the statements accurately?

19     MR. McDONALD:  It's supposed to capture what the

20  witness says, Your Honor, accurately.

21     THE COURT:  Okay.  I mean, I didn't think that was

22  that hard of a question, of course it's supposed to be

23  accurate.  But I just want to make sure we're on the same

24  page, right?

25     MR. McDONALD:  Yes, sir.

*Motion Hearing • May 15, 2024*

**8**

1    THE COURT: Okay. And when I'm reading the record

2    in this case, including the MOIs and the 302s, is it fair for

3    me to treat those, at least from your perspective, as an

4    accurate memorialization of what the witness had said in the

5    conversation that is memorialized in the 302 or MOI?

6    MR. McDONALD: It is accurate to the best of our

7    ability, yes, sir.

8    THE COURT: Okay.

9    MR. McDONALD: It is -- and I will just clarify,

10   it's a summary, it's not a transcript.

11   THE COURT: I get that.

12   MR. McDONALD: Okay.

13   THE COURT: Now, the agents that worked with you on

14   this case include Agent Mirabella and others, and you've had

15   opportunities to review the 302s and MOIs they have created

16   in this case, fair?

17   MR. McDONALD: Yes, sir.

18   THE COURT: And has it been your impression that

19   the agents working for you on this case, including Mirabella

20   and others, have prepared accurate 302s and MOIs?

21   MR. McDONALD: Yes, sir.

22   THE COURT: All right. And that they have been

23   careful in their preparation of those documents; is that your

24   impression?

25   MR. McDONALD: Yes, sir.

1    THE COURT:  Okay.  Is it fair for me to conclude

2    that whenever the agents working in connection with you on

3    this case communicated with Mr. Sereno, they created a 302 or

4    an MOI, unless the communication was trial prep with nothing

5    new added by Mr. Sereno; is that fair?

6            MR. McDONALD:  Yes, sir.

7            THE COURT:  Okay.  Let me then change gears here.

8    Again, I'm kind of giving you this direction to help organize

9    our conversation.  Those were background questions.  I want

10    to start asking some factual questions about the

11    investigation here, to get our head around that.

12            So can you tell me whether in response to subpoenas

13    issued by the Grand Jury the Rehmann Robson accounting firm

14    produced e-mails before the January/February 2023 timeframe?

15            MR. McDONALD:  Yeah.  I think -- can you give me a

16    minute?

17            THE COURT:  Sure.

18            MR. McDONALD:  I think there are docket entries

19    regarding that, because there was litigation in this

20    courtroom with respect to e-mails, there's privilege claims,

21    so there's a hard date where you had a hearing about

22    privilege claims by Cory Mann, and you ruled, and then we

23    received a big chunk of e-mails after that.

24            THE COURT:  Can you help me understand the time

25    frame for that?

 1          MR. McDONALD:  Yeah.  Let me pull up the docket

 2    here, sir.

 3          THE COURT:  I have to say your answer terrifies me,

 4    because I don't even have a vague recollection of that issue.

 5    I have trouble remembering what I had for breakfast, so I'm

 6    not doubting that we had this issue, but it would be helpful

 7    to refresh myself.

 8          By the way, if anybody on Mr. Mann's defense team

 9    knows the date here, I'm just trying to ground us with a

10    date.  So do you guys know the date that Mr. McDonald is

11    thinking of here?

12          MR. THOMPSON:  Not off the top of our heads,

13    Your Honor.

14          MS. KRIGER:  Your Honor, I know you addressed the

15    question to Mr. Mann's team.  Upon information and belief,

16    the only e-mails that were ever of issue that were in

17    Rehmann's possession were e-mails between Cory Mann and

18    Ken Boyer, but as I understand it, Mr. Mann's counsel did not

19    contest those.

20          MR. McDONALD:  If you give me a minute, Your Honor,

21    I'm looking through the docket.  I know we filed motions with

22    respect to --

23          THE COURT:  Sure.

24          MR. McDONALD:  It is in the February, March 2023

25    timeframe.  So I'm looking at I'm trying to find the ECF No.

*Motion Hearing • May 15, 2024*

1        THE COURT:  Here's why I ask this, I don't want to

2   hide the ball here, Mr. McDonald.

3        So do you have the defendants' reply brief?

4        MR. McDONALD:  Yes.

5        THE COURT:  Okay.

6        MR. McDONALD:  Do you -- it -- Counsel told me he

7   thinks it is February 2023.  I think it is February 2023.  I

8   see motions in limine to compel.  I know we briefed privilege

9   issue and it was resolved, there they are on the docket.  So

10  January 2023, February 2023 time period, there was litigation

11  with respect to exhibits, and we received e-mail from Rehmann

12  after that time period.

13       THE COURT:  All right.  On page 17 of the

14  defendants' reply brief -- I don't know if that you have in

15  front of you.

16       MR. McDONALD:  Sure.

17       THE COURT:  But I can read you what I want to ask

18  you about.  The defendants are pointing to a portion of

19  Special Agent Mirabella's testimony that e-mails from

20  Rehmann Robinson were not provided until January or February

21  of 2023, and the defendants say in the next sentence, this is

22  Docket No. 602, pageID.15981, that the government had

23  thousands of pages of relevant material from Rehmann

24  including e-mails as early as 2018, and no later than 2022.

25  Can you share your thoughts with me on that.

1    MR. McDONALD:  I don't believe that's accurate.  If

2  you want us to submit something with times on it, I can.  I

3  don't believe that to be accurate.

4        THE COURT:  Okay.  That's why I'm asking the

5  questions.

6        MR. McDONALD:  I can -- if you want to hear more,

7  we --

8        THE COURT:  You know what, they didn't cite

9  anything in their papers, they didn't have a record cite for

10  that, so I will ask them when they come up.

11        MR. McDONALD:  Can I -- we -- we were under the

12  impression we were working cooperatively with Rehmann and we

13  were receiving information from Locricchio.  We did subpoena

14  e-mails, they are correct, as early as 2018.  They asked us

15  if we could delay providing the e-mails because it would be

16  expensive for them to provide them, and we had access to

17  Locricchio at any time we asked, and we agreed we would delay

18  it until it got closer to the trial date, to ask for those

19  e-mails.  And then when we did ask for them, that's when

20  there was litigation about privilege in January and February

21  of 2023.  That's my memory.  Is that -- we didn't have

22  litigation about privileges, there was -- it's -- maybe this

23  Court will remember, there was a briefing on the *Kovel*

24  privilege and whether or not the accountants were part of an

25  attorney team in January/February 2023.  That is when we

1   first asked for e-mails.  Not that we didn't subpoena them

2   before then, but we didn't ask for them to be compelled and

3   be produced, because we believed they would be available when

4   we needed them, and that we had access to Locricchio to

5   answer questions.

6           So I would say that's not accurate to say that we

7   had thousands of Rehmann e-mails before that.  Someone might

8   have, but I don't believe that the government had them, but.

9           THE COURT:  Okay.  Next question, different topic.

10  Do you have the transcript of Special Agent Mirabella's

11  testimony from August 16th, 2023 available to you?

12          MR. McDONALD:  Yes, sir.

13          THE COURT:  Can you go to page 17 of that

14  transcript?  It is in the docket in a couple places, but I'm

15  looking at Docket No. 578-10, pageID.13920.

16          MR. McDONALD:  If you give me just a moment.  What

17  page, sir?

18          THE COURT:  The transcript page is 17.

19          MR. McDONALD:  Okay.  I'm there.

20          THE COURT:  Okay.  At the very bottom of that page,

21  line 24, you ask Special Agent Mirabella, "And did

22  Rachel Locricchio, nevertheless, tell the government that

23  Gravity Imaging was set up as a partnership?"  And he

24  answered, "Yes."  Do you see that?

25          MR. McDONALD:  Yes, sir.

1       THE COURT:  And then the next question is, Okay.

2   Fair to say, fair, too, you took notes on that interview and

3   recorded it in a 302?"  And he answers, "Yes."  Do you see

4   that?

5       MR. McDONALD:  Yes, sir.

6       THE COURT:  Now you've looked for the 302 for that

7   interview, I trust?  Look, I'm not pulling this out of thin

8   air.  The defendants point out in their brief that that's not

9   what Ms. Locricchio said, as memorialized in the 302.  That

10  in the 302, which is part of our record, Mirabella records

11  her as saying that it was set up as an LLC and taxed as a

12  partnership.  Are you familiar with that part of his 302?

13      MR. McDONALD:  Yeah, yes, I understand that to be

14  the same thing, Your Honor.  Setup as a partnership entity.

15  An -- yes, I understand that, and I don't believe that's

16  inconsistent.

17      THE COURT:  That's your answer to the question,

18  that you don't believe an LLC and a partnership are different

19  under the corporate law?

20      MR. McDONALD:  I believe that setting up as -- to

21  be taxed as a partnership is setting it up as a partnership.

22  I don't believe that's inconsistent, no, Your Honor.

23      THE COURT:  Okay.  Next topic, still talking about

24  Ms. Locricchio.  In Special Agent Mirabella's

25  August 16th, 2023 testimony, you elicit that prior to

 1   Ms. Locricchio's indictment, she was the main point of

 2   contact for Rehmann, correct?

 3            MR. McDONALD:  Yes, Your Honor.

 4            THE COURT:  And you elicited that she took

 5   handwritten notes while performing accounting services for

 6   Mr. Mann and his entities?

 7            MR. McDONALD:  I apologize.  Can I have just a

 8   moment to look at the 302 'cause what you've just quoted to

 9   me is not -- I thought it said filed a form 1065, not a

10   partnership, and I got distracted trying to find that

11   language.

12            THE COURT:  Yeah.  I was quoting you the exact

13   language from the 302, which is set up as an LLC and taxed as

14   a partnership.

15            MR. McDONALD:  Can you point me to it?  I'm sorry.

16            THE COURT:  Yeah, hold on.  It is Exhibit 15 to

17   defendants' motion to dismiss.

18            MR. McDONALD:  ECF No. 602 or ECF 578.

19            THE COURT:  It is ECF 578.

20            MR. McDONALD:  Thank you.

21            THE COURT:  Exhibit 16, page 2 of 4.

22            MR. McDONALD:  Got it.

23            THE COURT:  The sentence that I was asking you

24   about --

25            MR. McDONALD:  Excellent.

*Motion Hearing • May 15, 2024*

**16**

1    THE COURT: -- is "Gravity was set up as an LLC,

2 taxed as a partnership under IRS form 1065."

3    MR. McDONALD: Thank you. I remember the

4 form 1065, and then you didn't say it, and then I was worried

5 I read something different, so now I understand. My answer

6 is the same. So, yes, that reads to me -- I read the whole

7 sentence as Gravity was set up as an LLC, taxed as a

8 partnership under IRS form 1065, which is set up as

9 partnership. I don't believe that's inconsistent. The whole

10 sentence -- I'm sorry. I just was double checking, because I

11 thought maybe you were reading something different. I

12 apologize sir. Thank you.

13    THE COURT: I'm now on a different topic, just for

14 clarity -- or my effort at clarity.

15    And I asked you if you elicited, during his

16 testimony in August of 2023 -- by "his," I mean Mirabella's,

17 that Ms. Locricchio was the main point of contact for

18 Rehmann, and you agreed that you did that.

19    I asked if you elicited that she took handwritten

20 notes. You agree with me that came out in his testimony?

21    MR. McDONALD: Yes, Your Honor.

22    THE COURT: All right. You asked him before the

23 Grand Jury, did the government subpoena those notes

24 before 2023, right?

25    MR. McDONALD: Yes, sir.

```
 1            THE COURT:  Okay.  And then you asked him that
 2    those notes were not produced until 2023, after
 3    Ms. Locricchio was indicted.  Do you recall that line of
 4    questioning with him?
 5            MR. McDONALD:  I do, and --
 6            THE COURT:  I haven't even asked my question yet.
 7    It is just a yes or no.  Okay.
 8            So the defense argues that that line of questioning
 9    was misleading because it left an impression that
10    Ms. Locricchio withheld her handwritten notes from
11    production, and the defense has presented evidence that her
12    notes were provided to Brian Lennon, and that it was a
13    dropped ball at Warner Norcross that led to the delay in the
14    production of at least a portion of her notes to the
15    government.
16            What is your response to the defense's argument
17    that that is a misleading portrayal of Ms. Locricchio?
18            MR. McDONALD:  It is not misleading.  Locricchio
19    did not provide her notes from 2018, when we first subpoenaed
20    it, to --
21            THE COURT:  Let me -- let me break my question down
22    into chunks.  I understand the government's position that she
23    has not provided notes post 2018.  I understand that
24    position.
25            With respect to pre-2018 notes, isn't it -- doesn't
```

1    it appear from the record that she provided at least those to

2    Mr. Lennon, to provide to you guys?

3            MR. McDONALD: If your question is, did she make

4    copies of her notes in January 2018 and scan them and give

5    them to the Rehmann lawyers, the answer is yes.

6            THE COURT: Okay.

7            MR. McDONALD: I don't think -- I can just tell

8    you, Your Honor, I don't believe that the Grand Jury was

9    misled. I know that it is true that we did not receive her

10   handwritten notes for the time period of the returns that

11   were charged.

12           THE COURT: The -- the way this lays out, though,

13   and I'll give you a chance to respond, is the way you

14   establish her state of mind and the way you're building your

15   proofs for the returns that were charged, your -- your

16   evidence starts with a handwritten note by her, in 2015,

17   where you believe she acknowledges that Gravity was set up as

18   single member LLC. That's the -- that's one -- if it's not

19   the first, it's an early step in your chain. It's a piece of

20   evidence that you believe is inculpatory, fair?

21           MR. McDONALD: Yes.

22           THE COURT: Okay. So when you told the Grand Jury,

23   when you elicited that she didn't provide notes, period,

24   without any distinction in time, why didn't that leave the

25   Grand Jury with the impression that what she didn't provide

*Motion Hearing • May 15, 2024*

1   was this -- among other things, this key handwritten note

2   that you highlighted for them?  Why wouldn't that have been a

3   natural conclusion for them?

4           MR. McDONALD:  Because that wasn't the question,

5   Your Honor.  The question was, we subpoenaed notes from 2018

6   until 2023 and --

7           THE COURT:  Hold on one sec.

8           MR. McDONALD:  Okay.

9           THE COURT:  The questions, when you read them in

10  context, don't limit the date range of your request to 2018

11  to 2023, instead that is identified as the time frame during

12  which you were issuing subpoenas for e-mails.

13          MR. McDONALD:  May I have a moment, Your Honor?

14          THE COURT:  At best, it's ambiguous on pages 15

15  and 16 of his questions -- of his transcript.

16          MR. McDONALD:  May I have a moment, Your Honor?

17          THE COURT:  Sure.  And when you get to 15 and 16, I

18  can read you the questions that I'm looking at.

19          MR. McDONALD:  What pages are you on, sir?

20          THE COURT:  So go to page 15 of Mirabella's

21  testimony.  Again, I'm just looking at ECF No. 578-10,

22  pageID.13918, line 6.  Tell me when you're there.

23          MR. McDONALD:  Yes, sir.

24          THE COURT:  And the question is, "And those

25  subpoenas were issued from approximately, say, 2018 to at

1   least 2023?"  Answer, "Yes."

2           When I read that, I was looking at -- I was

3   understanding that as the timeframe during which you were

4   issuing subpoenas, not the date range for documents that you

5   were seeking.

6           MR. McDONALD:  I understand what you're saying.  I

7   don't read it as ambiguous.  I don't agree, but I -- I don't

8   agree.  And I can tell you that the only handwritten notes we

9   received were handwritten notes created before the Grand Jury

10  investigation began.  We received no hand -- does that make

11  sense?  There are no handwritten notes created after the

12  first subpoena was issued.

13          THE COURT:  Look, you -- the question here is on

14  page 16, "And those subpoenas were issued from -- " the word

15  is "from."

16          MR. McDONALD:  Exactly, yes.

17          THE COURT:  "-- from approximately 2018 to 2023?"

18          MR. McDONALD:  And we received no handwritten notes

19  covering the time period of 2018 to 2023.

20          THE COURT:  The way I read that question is that

21  you were issuing various subpoenas during that time, for

22  e-mails and for handwritten notes.

23          MR. McDONALD:  Yes, sir, I understand.  Just give

24  me a moment.  I'm sorry.

25          THE COURT:  And then you say a few lines down on

1   the same page, "Later did you learn that she had scanned

2   notes in 2018, and these are the scanned notes."  These being

3   the notes that you find highly inculpatory.  And then you

4   say, "They were not provided until after the Grand Jury

5   indicted her."

6         So isn't the impression that is created here that

7   what happened was Locricchio created notes, scanned them,

8   she's the point person, she didn't provide them, and the note

9   that wasn't provided is this inculpatory note.  Isn't that

10  the impression?

11        MR. McDONALD:  That is not the impression.  That is

12  what happened.  And they are free to question Mr. Carvo and

13  we are free to question Mr. Carvo, and he can give us

14  whatever answer he would like to give us.  There are

15  instances where Rachel Locricchio was spoken to between 2018

16  and 2023, and we asked where the handwritten notes were, well

17  into February of 2023, and they -- they didn't appear until

18  after.

19        So I disagree that any of this is misleading.  And

20  I understand that we have an e-mail from Mr. Carvo, and we

21  are free to ask him questions about what happened.  I don't

22  believe that there is a misimpression.  It is true that she

23  was the point person.  It is true that we subpoenaed them

24  over and over again, and asked for them.  It is true that

25  they did not show up until after she was indicted.  And it is

1  true that there is an e-mail that says she was contacted by

2  defense counsel, and she is the attorney that currently

3  represents Rehmann, Madalaine Lane was contacted by defense

4  counsel and then did an inquiry, and then the result was that

5  they found they had been scanned and never turned over,

6  because of a -- some sort of oversight or logistical error

7  that remains unexplained.

8           THE COURT:  Isn't that a problem on the Warner

9  Norcross end of things?

10          MR. McDONALD:  I believe it's a problem on the

11  Rachel Locricchio end of things, who is our point of contact

12  to provide documentation that we requested over and over

13  again, between 2018 and 2023.

14          THE COURT:  Didn't all documentation exchange go

15  through the lawyers?  In other words, was she ever

16  hand-delivering stuff, or wouldn't she give it to the Rehmann

17  lawyers and then they would give it to you?

18          MR. McDONALD:  I think that it had to have come

19  though the lawyer, because that's how they would have

20  operated.  I don't know that we ever spoke to her where there

21  wasn't a lawyer sitting next to her.  I do know that we asked

22  for them over and over, with a lawyer sitting next to her,

23  and I do know what never happened is that she said she

24  already scanned those, I can scan them again, or here are the

25  more recent version, or today's February 2019, and there's

 1   another year's worth of notes, I just met with him a year

 2   ago.  That is not a misimpression, that's exactly what

 3   happened.  And what you are -- I hear -- I don't believe that

 4   there was a misimpression.  I believe that this was a defense

 5   argument that, hey, it's Scott Carvo's fault.  But

 6   Scott Carvo, the tech guy, or the lawyer who's responsible

 7   for discovery production, was not the person that we were

 8   meeting with and asking for additional documents.

 9   Rachel Locricchio was.  And she had a lawyer sitting next to

10   her, who has also been subpoenaed, who I --

11             THE COURT:  Doesn't the evidence before me indicate

12   she gave the handwritten, scanned-in notes to her lawyers way

13   before she was indicted?

14             MR. McDONALD:  She gave notes up to January 2018,

15   to the lawyer before she was indicted.

16             THE COURT:  All right.

17             MR. McDONALD:  She did not give notes from 2018

18   to 2023.

19             THE COURT:  I get that.  But the questioning, it

20   seems to me, on pages 15 and 16, especially when you are

21   talking about these are the scanned notes, on page 15 of the

22   transcript, the notes you're referring to are this highly

23   inculpatory note that you believe to be highly inculpatory,

24   and I think this creates the impression that she was trying

25   to hide that, and to me, that's misleading.  So.  Okay.

1          Brand new topic, and I want to be very candid that

2     these next topics I view as just a distinct topic.  Okay.

3          So looking at Agent Mirabella's testimony -- I

4     think you have the transcript in front of you.  Would you

5     turn to page 20, please.

6          MR. McDONALD:  Sir.

7          THE COURT:  Okay.  Do you see on line 15, there's a

8     question, do you see that?  So I'm looking at my Docket

9     No. 578-10, pageID.13923.  Do you see that?

10          MR. McDONALD:  Yes, sir.

11          THE COURT:  The question there, and it's asked in

12     August of 2023, is, "And have you heard Anthony Sereno tell

13     you and others that he understood he was not an owner of

14     Gravity Imaging ever?"  Do you see that question?

15          MR. McDONALD:  Yes, sir.

16          THE COURT:  Can you identify for me, with

17     precision -- the answer is, "Yes."  You see that?  That's on

18     the next line.

19          MR. McDONALD:  Yes, sir.

20          THE COURT:  Okay.  What specific statements of

21     Mr. Sereno is Agent Mirabella referring to there?

22          MR. McDONALD:  He's referring to Sereno's

23     description of the buyout -- excuse me, of the bonused-out

24     arrangements with Cory Mann.

25          THE COURT:  Okay.  So what I'm looking for is

1    specific citation in the record.  Is he referring to a

2    statement that was memorialized in a 302?  Is he referring to

3    trial testimony?  With great specificity, identify for me

4    every statement in this record that Mirabella is referring to

5    when he gives that answer, please.

6            MR. McDONALD:  So I would refer to you ECF No. 594.

7            THE COURT:  Okay.  Can you just tell me what it is,

8    so I can try to find it?

9            MR. McDONALD:  Government's response to the motion

10   to dismiss.

11           THE COURT:  Page what?

12           MR. McDONALD:  I'm trying to see where it starts.

13   Starting on page 16.

14           THE COURT:  Okay.  So when I look at page 16, I see

15   potentially three citations to the record.

16           MR. McDONALD:  Correct.

17           THE COURT:  Three statements that Mirabella could

18   have been referring to here.

19           MR. McDONALD:  That's correct.

20           THE COURT:  Let take the easy one first.  The one

21   that you block quote from Attachment C to your motion, is

22   made in March 21, 2024, right?

23           MR. McDONALD:  And that's afterwards, yes, sir.

24           THE COURT:  So we're certain --

25           MR. McDONALD:  Yes, sir.

1     THE COURT:  We're positive that's not what

2  Mirabella was referring to.

3     MR. McDONALD:  Agreed.

4     THE COURT:  So that leaves two citations --

5     MR. McDONALD:  Agreed.

6     THE COURT:  -- that Mirabella could have been

7  referring to when he said Anthony Sereno told him --

8     MR. McDONALD:  Agreed.

9     THE COURT:  -- and others.  Okay.  So let's look at

10  those citations.

11     The first one is an interview summary of

12  September 1, 2022.  That's a -- that summary is attached to

13  the defendants' motion to dismiss, as Exhibit 7.  Do you have

14  that?

15     MR. McDONALD:  Yes, sir.

16     THE COURT:  Okay.  Where in this document does

17  Mr. -- is it memorialized that Mr. Sereno said he, quote,

18  "Understood he was not an owner of Gravity Imaging ever."

19     MR. McDONALD:  It's -- in the 302.  It is labelled

20  at the bottom of page 203 -- or 2 of 3 and going into 3 of 3.

21  I think it's probably highlighted on your copy.

22     THE COURT:  Right.

23     MR. McDONALD:  It's when he gives a description of

24  the bonused-out.

25     THE COURT:  Do you see the word, "understood," "not

1    an owner," anything like that in here?

2              MR. McDONALD:  No, I don't.

3              THE COURT:  No, it's not in there.

4              MR. McDONALD:  But it does have in quotes,

5    "bonused-out," and this is not a transcript, so it doesn't

6    have every word that he said.

7              THE COURT:  It has "bonused-out" and it refers to

8    Sereno becoming a partner at Gravity, right?

9              MR. McDONALD:  Yes.

10             THE COURT:  Those are Mirabella's words.  Those are

11   Mirabella's words describing what he believes Sereno said?

12             MR. McDONALD:  Correct.

13             THE COURT:  Okay.

14             MR. McDONALD:  Are you -- so, I'm sorry.  Are you

15   asking me to show you a quote where the quote --

16             THE COURT:  Here's the point that I'm going to

17   drive at with every one of these questions.

18             MR. McDONALD:  Okay.

19             THE COURT:  You asked Mirabella about what Sereno

20   said --

21             MR. McDONALD:  Yes.

22             THE COURT:  -- and told.

23             MR. McDONALD:  Yes.

24             THE COURT:  And absolutely, you are not going to be

25   able to point me to a damn thing in this record that supports

1   that, it's not even close.  And what we're going to do is

2   we're going to go through it together, and we're going to

3   bring that out.

4           MR. McDONALD:  Okay.  That's fine.

5           THE COURT:  This 302 --

6           MR. McDONALD:  Yes.

7           THE COURT:  -- isn't even close to what you asked

8   and he verified during this Grand Jury testimony.

9           MR. McDONALD:  When Sereno explains on

10   September 22nd -- September 1st, 2022, an explanation of the

11   bonused-out arrangement, he did say that he wasn't really an

12   owner.

13           THE COURT:  You know what, that's exactly why I

14   started this hearing with my questions.

15           MR. McDONALD:  I understand.

16           THE COURT:  It's my old days as a lawyer to lock

17   the person in.  It's entirely incredible -- it's wholly

18   unbelievable for you to come here and tell me that during

19   this September 1, 2022 session, Sereno actually said that he

20   wasn't an owner, that this was fake, he understood that.

21           Is there an audio recording of that interview.

22           MR. McDONALD:  No.

23           THE COURT:  Okay.  How can you possibly take that

24   position, given the way you and I started this dialogue, the

25   whole purpose of the 302, that this is a critical comment, if

1    he made it, and it's not even remotely in here.  How can you

2    take that position?

3            MR. McDONALD:  Because it has, right here in

4    this 302, the -- a summary, and the quote of bonused-out, and

5    if you asked him what bonused-out means, you get a long

6    explanation of how he describes what bonused-out means.

7            THE COURT:  And it -- that explanation is

8    summarized in here, and the wording that is in here is much

9    more consistent with him being an owner than not being an

10   owner.  To say, I'm a partner at Gravity, you want -- when I

11   look at his trial testimony, you want me to look at these

12   propositions and say, when he used the term, "with Gravity,"

13   that's important.  If I'm going to do that there, then I'm

14   going to do that here.  And when he says he's a partner at

15   Gravity, that's much more consistent with being an owner of

16   Gravity.  And then he says after joining Gravity, that's

17   another way to say I'm part of Gravity.  There's nothing in

18   this 302 that suggests to me -- there's nothing in this 302

19   that, to me, is consistent with this question and answer that

20   you gave here, nothing.

21           Okay.  The next citation that you give is to

22   Sereno's trial testimony in one of our more recent trials.

23   And I've got to say this is closer.  I'm going to acknowledge

24   that the testimony that you cite is closer, but let's look at

25   it.  It is --

```
 1            MR. McDONALD:  Is that Exhibit 8 on the defendants'
 2   motion to dismiss, ECF No. 578?
 3            THE COURT:  I don't think so, but hold on.  No.  I
 4   think you guys attached it, didn't you?
 5            MR. McDONALD:  We did.
 6            THE COURT:  Do you know where it is on yours?
 7            MR. McDONALD:  Yes, sir.
 8            MS. KRIGER:  Your Honor, I believe the Court is
 9   looking for in and around what would be page 182, but it's
10   ECF No. 411, pageID.8048.
11            MR. McDONALD:  It's Attachment H on the
12   government's response, ECF No. 594, Attachment H, as in
13   hotel.
14            THE COURT:  I still can't put my hands on this damn
15   testimony.  Hold on one sec.
16            MS. KRIGER:  Also Exhibit 8 to the defendants'
17   motion to dismiss, so just after the --
18            THE COURT:  Okay.  That's easier.  Thank you.  So I
19   think the part of this that you want me to read is page 41 of
20   his trial transcript; is that correct?
21            MR. McDONALD:  I don't know -- like 35, we
22   highlighted to, we also highlighted to 41 and 42, yes,
23   Your Honor.  It is highlighted in the version we submitted,
24   Your Honor.
25            THE COURT:  So this is his trial testimony from
```

 1  July 14, 2023.  I'm looking at -- it appears in our record as

 2  ECF No. 414, that's where that transcript was filed

 3  originally, but it's also attached as Exhibit 8 to the

 4  defendants' motion to dismiss.

 5       And can you point me where in here Sereno says,

 6  quote, "He understood he was not an owner of Gravity Imaging

 7  ever."

 8       MR. McDONALD:  There's not a quote in that

 9  language.  Again he's described in the bonused-out.  There is

10  not a quote in the way that you are asking.  It is not there,

11  you are correct.

12       THE COURT:  You say, the way I'm asking.  Here's

13  what you didn't say when you were questioning

14  Special Agent Mirabella.  You didn't say something like this:

15  Special Agent Mirabella, has Mr. Sereno ever said anything

16  that led you to conclude he believed he wasn't an owner?

17       Your question was quite specific.  You said, "Did

18  he ever tell you and others that he understood he was not an

19  owner of Gravity Imaging ever?"  The parts of the -- of the

20  transcript that you cite me to, the closest that we

21  come -- well, you tell me, what words in this transcript of

22  his trial testimony of July of 2023 constitute him, quote,

23  telling anybody that he understood he was not an owner of

24  Gravity Imaging ever?  And moreover, on line 19 of page 20 of

25  Mirabella's testimony, it doesn't just stop there, that he

1    believed that he was a partner in the sense that he was a

2    business partner who received money for each time he used

3    stolen reports, but not a partner that he owned.  Where is

4    that distinction made anywhere in here?

5                MR. McDONALD:  When he describes checks that are

6    written as member distributions, on page 35, as a bonus given

7    out to John and I.

8                THE COURT:  All right.  Mr. McDonald, before I had

9    this job, I was an equity partner in a law firm and I got

10   bonuses.  Why does the term, "bonus" -- when my partners

11   would cut me a bonus, I wouldn't say, oh, gees, I don't own

12   part of this firm.

13               MR. McDONALD:  May I answer your question?

14               THE COURT:  That's why I asked it, yeah.

15               MR. McDONALD:  Okay.  So when you asked Sereno to

16   explain what bonused-out means, he would explain that is how

17   he understood the scheme where he was going to be made a

18   partner on tax returns and be written checks that say member

19   distribution, but he didn't, in reality, or -- own Gravity

20   Imaging or have an interest in Gravity Imaging.  That these

21   were bonuses on top of the money that he was getting for his

22   advertising-marketing work.

23               THE COURT:  Here's my point, I hear you saying

24   those words now.

25               MR. McDONALD:  Yeah, can I --

1    THE COURT:  Go ahead, because I want to give you

2    every possible opportunity, and I have to hold myself back,

3    so I promise I won't interrupt you.  Go ahead.

4    MR. McDONALD:  That's how he describes what

5    bonused-out means.  So when you ask me where it is, that's

6    where it is, because that is how -- he is not an equity

7    partner at a law firm, he understands bonuses being something

8    on top of the money that he was already getting, and

9    if -- but not a member distribution to someone who is, in

10   reality, an owner, rather somebody who is pretend an owner,

11   and that's what the bonused-out, in quotes, means in the

12   September 2022.  But it's not a transcript, and those words

13   that you are looking for as a transcript are not there, I

14   agree.  But you asked me to point to where that happened, and

15   I can tell you --

16   THE COURT:  But -- go ahead.

17   MR. McDONALD:  Thank you.  Before -- that

18   Special Agent Mirabella heard those actual words come out of

19   Sereno's mouth before he testified and during trial prep for

20   this trial when we asked him to explain, what are you talking

21   about when you mean bonused-out?  What are these checks?

22   When you say it is a bonus, can you tell us what you --

23   THE COURT:  Okay.  Remember -- remember going back

24   to our earlier conversation -- our beginning conversation, I

25   very intentionally locked you in.

1           MR. McDONALD:  I said --

2           THE COURT:  You're locked in.

3           MR. McDONALD:  I said it was a summary, not a

4    transcript.

5           THE COURT:  I said to you, when does a new 302 get

6    generated?  And you said, if there's anything new --

7           MR. McDONALD:  Agreed.

8           THE COURT:  -- and there's not a 302 prior to,

9    quote, trial prep, for any case --

10          MR. McDONALD:  Correct.

11          THE COURT:  -- that mentions this whole fake owner.

12   So if Sereno said that during trial prep, we would expect to

13   see it in a 302 generated in connection with trial prep,

14   because it would be new.

15          MR. McDONALD:  And we did not interpret it as new,

16   because he had already said in September of 2022.

17          THE COURT:  Look, you can't -- you can't take the

18   position here that he said it in 2022, because if he said it

19   in 2022, it would be in a 302, by your own acknowledgment.

20   It's not in there.

21          Here's the clearest indication it's not in there.

22   Okay.  You have said to me at the last hearing, well, one of

23   the reasons it's not in a 302 is because he speaks in jumbles

24   and we don't know how to take it and put it into a neat 302.

25   Do you remember saying that to me?  They quotes it back to

1  you in --

2          MR. McDONALD:  And I think every time I read it, I

3  read it as you won't -- you will do what you're doing right

4  now and ask me to point to the exact words, and I cannot do

5  that.

6          THE COURT:  Look, in March of 2024, you guys

7  generate a 302 that spells out in great detail, this -- these

8  words that Sereno said; that he didn't understand himself to

9  be an owner, that it was fake.  There is absolutely no reason

10  to believe that if he had said the same thing in any prior

11  meeting, it wouldn't be in a prior 302, just like it was in

12  the March 2024 302.

13          MR. McDONALD:  But that's what happened, because

14  when he explains bonused-out, he gives a long explanation and

15  we've summarized it as bonused-out.

16          THE COURT:  Boy, then that's going to end up maybe

17  being a huge problem for you.

18          MR. McDONALD:  I understand.

19          THE COURT:  Okay.

20          MR. McDONALD:  I understand.

21          THE COURT:  Let me switch to my next question here,

22  which is, you meet with him in March 2024, and you show him

23  his Grand Jury testimony from 2020, right?  And his Grand

24  Jury testimony in 2020 was that he was an owner, right?

25  Unqualified, he says he's an owner, right?

1          Let's just pull it up, it'll be helpful.

2          I've got so many damn pieces of paper here.

3          Okay.  So in the Grand Jury testimony that

4    Mr. Sereno gave on January 15th, 2020, it's attached as

5    Exhibit 5 to the motion to dismiss.  Would you go to page 25

6    of that testimony, please.

7          MR. McDONALD:  Yes, I'm there.

8          THE COURT:  Okay.  So on page 25, line 19, you

9    asked Mr. Sereno, "At some point did you get an ownership

10   interest in Gravity?"  And he says, "Yes."  Do you see that?

11         MR. McDONALD:  Yes.

12         THE COURT:  He says nothing about a fake interest

13   or anything, he just says "yes," right?

14         MR. McDONALD:  That's what it says, yes.

15         THE COURT:  Then you say, on the top of page 26,

16   you say, "So whatever rate you were charging Gravity was too

17   much to cover and that you negotiated to get an ownership

18   interest instead; is that correct?"  He says, "Yes."  Right?

19         MR. McDONALD:  Yes.  You're on page 27 -- or 26

20   now?

21         THE COURT:  I'm on 26.

22         MR. McDONALD:  Yes.

23         THE COURT:  Do you see that?

24         MR. McDONALD:  Yes.

25         THE COURT:  And then you asked him, on line 13,

1    "Who did you negotiate with to be an ownership or a member?"

2    And he says, "Cory Mann."  Do you see that?

3                MR. McDONALD:  I do.

4                THE COURT:  Okay.  This is -- I hope this is an

5    easy question.

6                On its face, this testimony here is inconsistent

7    with the version of events that he gives in the

8    March 2024 302.  Can we agree with that, on its face?

9                MR. McDONALD:  Yes, sir.

10               THE COURT:  Okay.  So understandably, when you meet

11   with him in March 2024, you show him this and you ask him,

12   and you said, hey, how do you explain what you said in 2020,

13   right?

14               MR. McDONALD:  Correct.

15               THE COURT:  And he says -- you correct me if I'm

16   wrong, but I don't mean to be exact here, but --

17               MR. McDONALD:  He says whatever it says in the 302,

18   correct.

19               THE COURT:  But it's something to the effect

20   of -- you know what, I want to get the 302, because it's

21   important.  This is Exhibit 18 to the defendants' motion to

22   dismiss -- oh, hold on, that might be the wrong one.  Oh,

23   yeah, no, this is the right one.  Okay.

24               Exhibit 18, do you have that, Mr. McDonald?

25               MR. McDONALD:  I don't.  Give me just a moment.

1              THE COURT:  Take your time.

2              MR. McDONALD:  Did you say it is Exhibit 18?

3              THE COURT:  It is Exhibit 18 to the motion to

4    dismiss.  It is a 302 that was prepared on March 29th, but it

5    was of the Sereno interview on March 21st.

6              MR. McDONALD:  Okay.  Yeah, I'm there.

7              THE COURT:  All right.  You're there?  Okay.  So

8    will you go to page 2, please.

9              MR. McDONALD:  Okay.

10             THE COURT:  So there's a paragraph, three from the

11   bottom, and I want to just read it so we are together.  This

12   is -- so we have his exact explanation for why his current

13   version is different from his Grand Jury testimony.  And

14   he said -- or, this is your summary -- your agent's summary

15   of what he said.

16             It says, "In his Grand Jury testimony in 2020,

17   Sereno said "yes" to owning Gravity, but he thought he was

18   answering "yes-or-no questions."  Sereno reiterated that he

19   felt the same way about his ownership of Gravity during his

20   Grand Jury testimony as he did at the time of this interview:

21   Sereno/Robin Street owned Gravity on paper and not in

22   actuality.  Sereno/Robin Street's ownership of Gravity was

23   "fugazi," meaning "fake."  Sereno only said "yes" in the

24   Grand Jury in 2020, because he knew he was the owner on paper

25   and if he knew he could elaborate on his answers, Sereno

1    would have said that his ownership of Gravity was only an

2    agreement on paper."  Do you see that?

3              MR. McDONALD:  I do.

4              THE COURT:  All right.  So that's what Mr. Sereno

5    told you was the explanation for the difference in his

6    testimony, right?

7              MR. McDONALD:  Yes.

8              THE COURT:  All right.  Did you believe that?

9              MR. McDONALD:  Do I believe his explanation?

10             THE COURT:  Yes.

11             MR. McDONALD:  Yes, I believe his explanation.

12             THE COURT:  Okay.  Did you do anything to examine

13   whether this explanation, in any way, holds up?

14             MR. McDONALD:  I don't understand your question.

15             THE COURT:  He tells you -- he gives you this

16   explanation.  He says to you, as I'm sitting in the Grand

17   Jury in January of 2020, I believed I could only answer yes

18   or no.

19             MR. McDONALD:  Oh --

20             THE COURT:  And I believed I could not elaborate

21   and that's why I didn't use this -- give this explanation

22   back then.  He says that to you, fair?

23             MR. McDONALD:  Yes.

24             THE COURT:  Okay.

25             MR. McDONALD:  I'm sorry.  I don't understand what

1   you -- I don't understand your question.

2            THE COURT:  You are meeting with him and he gives

3   that explanation for why his Grand Jury testimony in 2020

4   doesn't match what he's telling you now.  Fair?

5            MR. McDONALD:  Yes -- yes, I'm following you.  I

6   don't understand the part -- I don't understand what you are

7   asking.

8            THE COURT:  That's why I'm going to go step by

9   step.

10           MR. McDONALD:  Okay.

11           THE COURT:  You're meeting with him --

12           MR. McDONALD:  Can I step away for just a minute,

13   because maybe my partner understands and I'm being dense?

14           THE COURT:  I'm going to try again, but, of course,

15   you can step away.

16           MR. McDONALD:  Okay.

17           (An off-the-record discussion was held

18           at 10:26 a.m.)

19           THE COURT:  Okay.  Can we try again?  All right.

20   So you're with Mr. Sereno in 2024.  You show him his Grand

21   Jury testimony, and he says that I didn't say in 2020 what I

22   said in 2024 because, in 2020, first, I only thought I was

23   answering yes-or-no questions, and, second, I didn't believe

24   I could elaborate.  He gives that explanation, right?

25           MR. McDONALD:  Correct?

```
 1              THE COURT:  Okay.  At the time he gives it, do you
 2    believe that explanation?
 3              MR. McDONALD:  I did.
 4              THE COURT:  Okay.  Did you do anything to
 5    assess -- to investigate whether that explanation makes sense
 6    or is reasonable?
 7              MR. McDONALD:  And you're asking me if I --
 8              THE COURT:  This is not a trick question.  He gives
 9    this explanation.  Witnesses appear before you all the time,
10    they make statements, and you've got to -- sometimes you've
11    got to do follow-up to see if the statement holds up.
12              Did you do any sort of analysis or evaluation to
13    figure out if that explanation for the discrepancy makes
14    sense?
15              MR. McDONALD:  Like, look -- and I don't --
16              THE COURT:  My question is not -- -
17              MR. McDONALD:  I'm sorry.  I don't understand.
18              THE COURT:  This is not a hard question.  He gives
19    you an explanation.
20              MR. McDONALD:  Correct.
21              THE COURT:  You're sitting there, and after he gave
22    that explanation, did you do anything?
23              MR. McDONALD:  Yes, I did a number of things.
24              THE COURT:  What did you do to determine whether
25    that explanation is credible or sensible?
```

 1          MR. McDONALD:  We looked over the Grand Jury

 2    transcript and the exhibits that he was shown and the

 3    evidence available to us at the time that he was giving his

 4    answer.

 5          THE COURT:  Okay.  So --

 6          MR. McDONALD:  Is that -- well, I didn't quite

 7    understand what you were asking.

 8          THE COURT:  Yes, yes.  So he tells you, when I'm

 9    sitting there in front of the Grand Jury in 2020, I thought I

10    could only answer yes or no, and I didn't understand I could

11    elaborate.  You say to yourself, okay, he says that, but I

12    need to see if that makes sense, and one way to see if that

13    makes sense is to look back at his Grand Jury appearance,

14    which you did?

15          MR. McDONALD:  Yes.

16          THE COURT:  Okay.  Let's go back and look at that

17    together and see if you and I come to the same conclusion

18    about the reasonableness of his explanation.  Do you

19    have -- can you go to page 4?

20          MR. McDONALD:  Of the Grand Jury --

21          THE COURT:  Of his Grand Jury testimony.

22          MR. McDONALD:  Okay.

23          THE COURT:  Okay.  Do you see on page 4, line 14

24    you're advising him about his appearance, and you tell him

25    that he just promised to tell the truth, so if he provides a

1  false answer to any question, he could be charged with an

2  additional felony.  You saw that when you went back and did

3  your review, right?

4       MR. McDONALD:  Yes.

5       THE COURT:  Okay.  And then you said to him, "If I

6  ask you a question that's confusing or anything, you just let

7  me know."  You saw that, right?

8       MR. McDONALD:  I did.

9       THE COURT:  Okay.  Will you flip to page 6?

10      MR. McDONALD:  Yep.

11      THE COURT:  Okay.  Then on page 6, line 13, you

12  remind him that he has an agreement with the government to

13  cooperate, right?

14      MR. McDONALD:  Correct.

15      THE COURT:  All right.  And what you tell him on

16  line 13 of page 6 -- I want to make sure I quote it.  You

17  make sure that he understands, "That you are required by this

18  agreement to provide truthful information and to not withhold

19  the information.  You have to -- not only do I have to ask

20  you the right questions, you have to volunteer questions

21  that -- volunteer answers if my questions are in the area of

22  something that you understand."  You told him that, right?

23      MR. McDONALD:  Correct.

24      THE COURT:  Okay.  Let's flip to the end.  Page 34.

25      MR. McDONALD:  I'm there.

1     THE COURT:  You see line 18?

2     MR. McDONALD:  Uh-huh.

3     THE COURT:  Here you say to him -- so this is at

4  the end of his testimony.  "So your testimony has been under

5  oath, which means that it all needs to be truthful and

6  honest.  If I asked you a question and you believe you gave a

7  false answer, you can change it now or after you speak to

8  your lawyer, and you can go home and take a nap, or tomorrow

9  morning you think, oh, I gave this answer wrong, if you let

10  your lawyer know -- I'm saying you can come back and we can

11  fix it.  Do you understand that?"  And he says he does.

12     MR. McDONALD:  Correct.

13     THE COURT:  Then, did you read this transcript to

14  see if there were any yes-or-no questions where his answers

15  were more than yes or no?

16     MR. McDONALD:  I didn't, but --

17     THE COURT:  That's just a yes or no.  Did you do

18  that?

19     MR. McDONALD:  No.  And may I please give a fuller

20  answer?

21     THE COURT:  Had you done that, would you have

22  discovered that at least in one -- I believe more than one

23  instance, he was asked a yes-or-no question, and at one

24  point, gave a four-line answer and was able to qualify his

25  answer to make sure it was truthful.  You now know that you

1   would have found that had you looked for that, right?

2           MR. McDONALD:  I understand.

3           THE COURT:  So here's my question.

4           MR. McDONALD:  Can -- can I give a fuller answer to

5   your question of, did I look back?

6           THE COURT:  Yes.

7           MR. McDONALD:  I did look back.  I also had

8   discussions with his attorney --

9           THE COURT:  Go ahead.

10          MR. McDONALD:  Your Honor, I'm trying to answer

11  your question, and I get the impression from you that I'm

12  irritating you, and I'm just --

13          THE COURT:  You're not.

14          MR. McDONALD:  I'm just trying to answer your

15  question.

16          THE COURT:  You are not irritating me.  Go ahead.

17          MR. McDONALD:  I had discussions with his attorney

18  about the same things that you are pointing out right now, so

19  I understand what you're saying.

20          THE COURT:  Okay.

21          MR. McDONALD:  And I accepted the answers that I

22  received from the attorney about why he answered in the way

23  that he did.  That is -- I follow what you're saying, is that

24  he was told if I'm not asking yes-or-no questions, you can

25  expand, or if there's confusion you can talk to your lawyer.

1    THE COURT:  It's more than that.  Okay.  It is

2  more -- it is much more than that.  He told you in March

3  of 2024, the reason I testified the way I did on this point

4  in 2020 was because I thought they were only yes-or-no

5  answers and I couldn't elaborate.  And the facts are, you

6  told him he was obligated to elaborate if that was necessary

7  to make something true.  You gave him an opportunity to come

8  back.  But it's not just that.  He, in fact, answered

9  yes-or-no questions -- not many, but some with, sometimes a

10  couple sentences, that when you just look at the evidentiary

11  record, it can't be reconciled with his explanation in 2024.

12  And I'm troubled by the fact that that's not obvious to you.

13    MR. McDONALD:  That's why I mentioned that I had

14  discussion with his attorney about these things and so sort

15  of resolved the inconsistencies.  I understand -- I

16  understand what you're saying.

17    THE COURT:  We have a contemporaneous record

18  in 2020, where he's given these warnings, and even more

19  importantly, he actually answers a yes-or-no question with

20  more information than with yes or no.  What can he possibly

21  say in 2024 that -- that somehow convinces you that he

22  actually believed he could only answer yes or no in 2020, on

23  the record we have from 2020?

24    MR. McDONALD:  Are you -- did you want me to answer

25  that?

1    THE COURT:  Yes.

2    MR. McDONALD:  I said I had discussions with his

3  attorney about that inconsistency, and that resolved my sort

4  of confusion about that.

5    THE COURT:  If you want to share it with me, I

6  would be pleased to hear it.

7    MR. McDONALD:  He was under the impression, with

8  respect to items on tax returns, the tax returns had what was

9  true on it, and that he wasn't to, like, go into more detail

10  unless I asked for more detail, to try to keep his

11  questions -- I'm just -- I --

12    THE COURT:  Look, I understand he's saying that

13  now.

14    MR. McDONALD:  Okay.  You're saying I shouldn't

15  believe him.

16    THE COURT:  I'm saying, how could any reasonable

17  person believe that explanation, given the contemporaneous

18  record in 2020, is my question.

19    MR. McDONALD:  Yes, sir.  I understand what you're

20  saying.

21    THE COURT:  Here's -- let me be as blunt as I can.

22  Okay.  Here's what the defense says in this case, and I want

23  to give you a full opportunity, and I'm gonna zip my mouth

24  after I ask this question.  What the defense says is -- and

25  this is not me, Mr. McDonald, this is them.  I want to try to

1    air out each side's argument as carefully as I can.  And I'm

2    paraphrasing the defense now.

3           The defense says, Mark McDonald and Chris O'Donnell

4    are in way too deep.  They have lost all objectivity and all

5    ability to function fairly as prosecutors.  And they point to

6    certain examples where they say the conclusions drawn by

7    McDonald and O'Donnell couldn't be drawn by any reasonable

8    person looking at the same record, and this is an example

9    they point to.

10          And -- again, this is them speaking, not me.  They

11   were very critical of you guys in the papers, you saw that.

12   And I want to make sure I give you a full opportunity to

13   explain to me how any reasonable person could look at

14   Sereno's 2024 explanation and conclude that it's a plausible

15   explanation for his testimony in 2020.

16          MR. McDONALD:  I spoke to his attorney about why he

17   would not expand on the answer in 2020.  His attorney

18   explained to me why the answers were this way.  I also met

19   with him in October of 2022, and we recorded it.  I was

20   present when he made statements from 2022, until his

21   testimony in 2023, where he indicated, consistently, that it

22   was a pretend partnership, it was not real.  So that is why I

23   believed that it was -- that the inconsistency and the way he

24   explained it was accurate.

25          THE COURT:  What did you just say?

1    MR. McDONALD:  That is the reason why I believed

2    his explanation regarding the inconsistency.

3          THE COURT:  Did you refer to a time that Sereno

4    talked about a pretend partnership just now?

5          MR. McDONALD:  We've already talked about it.

6    Nothing different than what we have already discussed.  I'm

7    referring to the same instances that we have already

8    discussed.  I'm just summarizing what we have already

9    discussed.  There is nothing different than what we have

10   already written in our response.

11         THE COURT:  When was the first time you learned

12   that Anthony Sereno's position was that he was an owner of

13   Gravity only on paper, in essence, a fake owner?  When did

14   you first learn that?

15         MR. McDONALD:  When he began to talk about the

16   bonused-out in October of -- or September of 2022, in

17   the 302.

18         THE COURT:  Okay.  Hold on.

19         MR. McDONALD:  That's my recollection.  If I have

20   something different in my notes later, I will let the Court

21   now, but I think that's correct.

22         THE COURT:  So you believe that in 2022, he told

23   you that he was a fake owner of Gravity?

24         MR. McDONALD:  Giving a long explanation about

25   bonused-out, which includes membership distributions being

1    really getting a bonus, not as owner, but as extra money for

2    being -- for doing advertising.

3            THE COURT:  And when he told you that in 2022, did

4    you believe it?

5            MR. McDONALD:  I don't know, Your Honor.  I don't

6    know.  We have inconsistent information between

7    Anthony Sereno and the tax returns and Rachel Locricchio at

8    that time.  And I believe -- quite frankly, Your Honor, I

9    believed Rachel Locricchio, because she was an accountant who

10   prepared the tax returns.

11           THE COURT:  New topic.  When you and I were

12   together before, on the hearing on the motion to get some

13   Grand Jury disclosure, I think that's the motion that came

14   before this, I believe you told me, and please correct me if

15   I'm wrong, that when you alleged, in the first three

16   indictments that were filed in this case, that the owners of

17   Gravity were Mann -- included Mann and Sereno, that you

18   didn't rely on Sereno's testimony for that proposition.  Is

19   that true?

20           MR. McDONALD:  I got lost there, but I recall the

21   conversation and we were relying on the accountants and the

22   folks at Rehmann, until the final third superseding

23   indictment.

24           THE COURT:  Let me try to ask a better question.

25   Sometimes my questions aren't great.

 1              In the original indictment in this case, there's an

 2     allegation in, like, paragraph 4 or something, about --

 3              MR. McDONALD:  In the introduction, yes.

 4              THE COURT:  Yeah, the ownership of Gravity.  And it

 5     at least lists Mann and Sereno, and I can't remember if it

 6     lists anybody else.  Are you with me?

 7              MR. McDONALD:  I recall, yes, I recall.

 8              THE COURT:  Was that allegation, in any way, in

 9     your view, based on the testimony that Sereno provided to the

10     Grand Jury in January of that year, or were you relying on

11     something else?

12              MR. McDONALD:  And I think I -- are you looking at

13     the transcript?  I already answered the question, I think,

14     and hopefully I said that we are relying on the folks at

15     Rehmann and the tax returns that were prepared.

16              THE COURT:  Yeah.  Okay.  So this is really what I

17     want to zero in on.  I think this is helpful.  So you're

18     telling me that at the time you prepared the original

19     indictment, when you alleged the ownership of Gravity, that

20     allegation was based on information or documents prepared by

21     Rehmann?

22              MR. McDONALD:  Yeah.  I'm sorry.  Are you asking me

23     the same thing again, because I got confused there in the

24     middle.

25              THE COURT:  Yeah.

 1          MR. McDONALD:  The paragraph 4 in the introduction

 2     of the second superseding indictment, is the one place where

 3     it says something about ownership, it is in the introduction.

 4          THE COURT:  Right.

 5          MR. McDONALD:  And we were relying on a tax return

 6     that says that.  Is that what you're asking me?

 7          THE COURT:  Yes.

 8          MR. McDONALD:  And I think that's what I said the

 9     last time you asked me this.

10          THE COURT:  Yeah.  I'm just trying to make sure I

11     understand the full universe of information.

12          MR. McDONALD:  I understand.  I understand.

13          THE COURT:  The only thing that you were relying

14     on, at that point, was a Rehmann-prepared tax return that

15     listed owners?

16          MR. McDONALD:  Yes.  You asked me this before, and

17     then you asked me, well, why are you alleging that, if Sereno

18     had something different?  And I will say it again, we are

19     required to allege what we think we can prove beyond a

20     reasonable doubt.  At that point, Rehmann is standing behind

21     their tax returns, even if -- when the second superseding

22     indictment comes out, Rachel Locricchio maybe has made some

23     inconsistent statements.  We still don't have evidence,

24     beyond a reasonable doubt, to say that that's not what the

25     tax returns say for some reason.  Until we get the

1    handwritten notes that have something different, that we

2    think we can prove beyond a reasonable doubt, that allegation

3    did not change.  Does that -- is that the transcript that you

4    are looking at?

5            THE COURT:  These are my notes.

6            MR. McDONALD:  Okay.  So that, I hope, is what I

7    said the last time you asked me, because that is what

8    happened from the DOJ's perspective.

9            THE COURT:  New topic, but kind of related.

10           One of the pieces of evidence that the defense

11   highlights in their motion is testimony by

12   Special Agent Mirabella, in March of 2022, that Gravity was

13   at one time owned by, among others, Sereno.  Do you remember

14   that testimony that --

15           MR. McDONALD:  A hundred percent, a hundred

16   percent.  I know exactly what you're referring to.

17           THE COURT:  So Mirabella testified to that, and the

18   defense highlights that and say that's misleading.  And your

19   response is, hey, that's a problem for the defense, because

20   Mirabella was relying on Locricchio when he explained who he

21   believe the owners were.  Do you remember that?

22           MR. McDONALD:  Can you show me exactly, because I

23   think there's a timeframe issue, also?

24           THE COURT:  Sure.

25           MR. McDONALD:  So can you just point me to what you

 1    are reading?

 2              THE COURT:  Sure.  Give me a second.

 3              MR. McDONALD:  Is that the response from the

 4    government?

 5              THE COURT:  Yeah.  Hold on.

 6              MR. McDONALD:  It has reference to Fayad?

 7              THE COURT:  Would you go to page 28 of your

 8    response, please.

 9              MR. McDONALD:  Did you say page 28?

10              THE COURT:  It is 27 and 28 of your response.

11              MR. McDONALD:  Yes.

12              THE COURT:  So on the bottom of 27, you're taking

13    on the defense argument where they -- they point out that

14    Mirabella testified that Sereno was, at one time, an owner.

15    You see that you start taking that on PAGE 27?

16              MR. McDONALD:  Yes.

17              THE COURT:  And Sereno is listed with a bunch of

18    others in his testimony.

19              And on page 28, you say this argument fails because

20    it does not note that the testimony on

21    March 2, 2022 -- that's Mirabella's testimony -- was based on

22    false information being provided by Defendant Locricchio.  Do

23    you see that?

24              MR. McDONALD:  I do.

25              THE COURT:  And then the citation for that, that

```
 1   you give, is Attachment S, at 24, which is Mirabella's
 2   March 2, 2022 Grand Jury testimony.  Do you see that?
 3              MR. McDONALD:  I do.  That's the testimony that
 4   they referenced and we are just citing it again, if I'm
 5   following along.  Is that correct?
 6              THE COURT:  A little bit.  So --
 7              MR. McDONALD:  I got lost there.  I'm sorry.
 8              THE COURT:  Do you have Mirabella's 2022 testimony
 9   in front of you?
10              MR. McDONALD:  Is it Attachment S of this very
11   motion we're looking at?
12              THE COURT:  It might be.  I'm looking at
13   defendants' -- it's Exhibit 11 to theirs.
14              MR. McDONALD:  Okay.  I think I have his testimony
15   from 2022, yes.
16              THE COURT:  So the part that the defendants find
17   significant is on page 12, where he testifies that he learned
18   that Gravity Imaging was owned at different points of time --
19              MR. McDONALD:  I'm following you.
20              THE COURT:  -- by, among others, Anthony Sereno and
21   John Angelo.  Do you see that on page 12?
22              MR. McDONALD:  I see the part.  I missed the
23   citation that you gave, because of the coughing.
24              THE COURT:  It's on page 12.  Do you see that?
25              MR. McDONALD:  Yes.
```

1          THE COURT:  And so the defendant says this is

2    significant because Mirabella later testifies that Sereno was

3    not really an owner.  That's their argument.  I'm not asking

4    you to agree with it.  I'm just giving context to this

5    question.  Okay.

6          MR. McDONALD:  Okay.

7          THE COURT:  And you say, hold on -- these are my

8    words now -- it is unfair for the defense to be citing this

9    testimony from Mirabella because this based on bad

10   information he got from Locricchio, so they sure the hell

11   better not be relying on this.  Is that basically one of your

12   responses?

13         MR. McDONALD:  I mean, I think that's what it says.

14   I'm sorry, I'm not tracking.  I think we say --

15         THE COURT:  I haven't yet gotten to the hard

16   question.  This is just, is that your position?

17         MR. McDONALD:  I think so, yeah.

18         THE COURT:  Okay.  So as support for that position,

19   you cite to page 24 of his testimony, which is 12

20   pages later.

21         MR. McDONALD:  Yeah.  Is that just going to be the

22   wrong page?

23         THE COURT:  No, it's not going to be the wrong

24   page.

25         MR. McDONALD:  Okay.

 1          THE COURT:  It's going to be a page where he refers

 2    to getting information from Locricchio as to the ownership

 3    change on December 21, 2017.  And my point is that you

 4    suggest that Mirabella told the Grand Jury -- or was relying

 5    on Locricchio when he said, at some point, Sereno was an

 6    owner, and your record citation to me doesn't support that

 7    proposition.  I want to give you a chance to respond.

 8          MR. McDONALD:  So it's a bad citation, is

 9    that -- you're saying, show me where Mirabella says he's

10    relying on Locricchio, is that what you're saying?

11          THE COURT:  For this point, yes.

12          MR. McDONALD:  Okay.  I'm just trying to follow

13    along.  Okay.  And you're saying page 24, you don't think

14    that's right, because -- and then I got lost.  Why is that

15    wrong?

16          THE COURT:  Let start -- 24 is not a page I picked,

17    it's your citation.  And 24 says --

18          MR. McDONALD:  Right.  I understand.

19          THE COURT:  I understand when I read 24, he was

20    talking about information that he got from the return

21    preparer, but he was talking about a particular piece of

22    information.

23          MR. McDONALD:  Okay.  I'm following you.

24          THE COURT:  And it was a particular piece of

25    information that had to do with an alleged change of

1  ownership in December of 2017.  That piece of information

2  doesn't speak to whether Locricchio is the one who told him

3  that Sereno was, at one point, an owner.

4         MR. McDONALD:  The tax returns were prepared by

5  Locricchio.  Each one of them says Sereno was an owner.

6  The '16, '17 and '18 tax returns were prepared -- is that

7  what you are saying?  You're saying, show me the evidence

8  where --

9         THE COURT:  Is that your answer?  So is your point

10  here -- instead of citing page 24, are you saying that when

11  Mirabella testified that Sereno was an owner, Mirabella was

12  relying on tax returns prepared by Locricchio.  Is that your

13  answer?

14         MR. McDONALD:  Yeah.  So on page 20 -- if you

15  look -- on page 20 -- sorry, Mr. Smith.  Give me just a brief

16  indulgence here, Your Honor.

17         So if we're looking at ECF No. 594, Attachment S,

18  this is Mirabella's March 2, 2022 Grand Jury transcript.

19  Page 23 of the transcript -- page 23 of the transcript, at

20  the bottom of the page -- so it says 23 at the top.  At the

21  bottom, the question, line 20, "Did you review and interview

22  the return preparer of the Cory Mann individual returns and

23  the -- I'm showing you Grand -- I'm sorry, I'm showing you

24  Grand Jury Exhibit C, as in Charlie, I'm sorry.  Did you see

25  interviews with Cory Mann's return preparer -- Cory Mann's

1    return preparer is Rachel Locricchio -- who did the 2017,

2    2018 Gravity Imaging tax returns and Cory Mann's own tax

3    returns that indicates she never saw a document

4    indicating..."

5             So that is the reference to -- is that what you are

6    asking me?  That is a reference to Locricchio, Cory Mann's

7    tax returns.

8             THE COURT:  That's what you cited and that's a

9    reference to Locricchio providing certain information.  The

10   information that she provided, as described on pages 23

11   and 24, to me, has nothing to do with whether Sereno was an

12   owner prior to this time.  But if you are telling me he

13   reviewed tax returns that showed that and that's what misled

14   him --

15            MR. McDONALD:  The tax returns, themself, show

16   Robin Street to be an owner in '16, '17 and they get a K-1

17   distribution in '18.

18            THE COURT:  All right.  So that's what Mirabella

19   was relying on.

20            MR. McDONALD:  And that's what it says, the return

21   preparer for Cory Mann's tax returns in those years.

22            THE COURT:  At the risk of being technical, because

23   this is a business where words matter, these pages don't say

24   that.  Your question says, did you see interviews, but it

25   doesn't talk about interviews writ large.  It's an interview

1    where she indicates she never saw a particular document.

2    That question and the answer to it don't speak to whether

3    Sereno was ever an owner of this, which is the testimony 12

4    pages earlier.  But you've given me a different reason that

5    he could plausibly say he was misled by Locricchio, but it's

6    just not this testimony.

7             MR. McDONALD:  But -- but -- but this

8    transcript that you're -- unless -- I apologize.  Unless I'm

9    confused, this December 2022 transcript is not presented to

10   show that somebody misled -- that Sereno misled Locricchio.

11            THE COURT:  Here, this is --

12            MR. McDONALD:  The only reason it is cited is to

13   say that the testimony they are citing has to do with the

14   preparation of tax returns and the preparation of tax returns

15   information, at that time period, came from Locricchio.  It's

16   not to say that she was misled by Sereno.  I think the record

17   eventually will show she has never spoken to or met Sereno.

18   It's to show that the tax returns, themselves, were being

19   relied upon, and those were prepared by Locricchio.

20            THE COURT:  Okay.  New question.  New topic.

21            One of the things that defendants are critical of

22   is your statement to the Grand Jury in August of 2023.  Do

23   you have that transcript in front of you, Mr. McDonald?

24            MR. McDONALD:  Brief -- yes.

25            THE COURT:  Okay.  So this is Docket 578-10.  You

1   may have it at a different spot.  I'm looking at

2   pageID.13929, the transcript is page 26 of the

3   August 16, 2023 Grand Jury.

4              MR. McDONALD:  Yes, sir, I'm there.

5              THE COURT:  And the defendants are critical of you

6   for saying on lines 21 through 25, the following:  "And there

7   are no documents that it ever became a partnership and the

8   person who's supposed to be the partner, Anthony Sereno, says

9   he was never a partner."

10             You understand the defendants are critical of you

11  for saying that?

12             MR. McDONALD:  Yes.

13             THE COURT:  I'm going go in my bite-size chunks.

14             MR. McDONALD:  Yes.

15             THE COURT:  Okay.  Your response to this, in your

16  papers, was that the defendants have completely taken this

17  statement out of context, because it relates to Count 10.  Do

18  I understand your response?

19             MR. McDONALD:  Yes.

20             THE COURT:  Okay.  This is my question for that.

21  It's not as if Count 10 is somehow conceptually distinct from

22  the underlying counts.  You tell the Grand Jury this, this is

23  in this same paragraph.  I think it's important to read the

24  whole paragraph.

25             On line 16 of page 26 you say, "and then, there's

1    also a Count 10, which is making a false statement, is

2    alleged by Rachel Locricchio --" and then here's the

3    key -- "for telling the government that Gravity Imaging was

4    always a partnership, whereas her notes and e-mails showed

5    that it was originally owned only by Cory Mann.  And there

6    are no documents that it ever became a partnership, and the

7    person who's supposed to be the partner, Anthony Sereno, says

8    he was never a partner."

9         So when I read this -- let me share my

10   interpretation and I'd invite your response.

11        It look to me like you're telling the Grand Jury,

12   in Count 10, we're saying she lied "for telling the

13   government it was always a partnership."  And then it seems

14   to me you have three pieces of evidence that you cite to the

15   Grand Jury as supporting that conclusion that it wasn't

16   always a partnership.  First, her notes and e-mails show it

17   was different.  Second, there are no documents that show it

18   ever became a partnership.  And, third, the person who is

19   supposed to be the partner says he was never a partner.

20   Isn't that what you're telling the Grand Jury?

21        MR. McDONALD:  So -- I'm sorry.  I'm

22   still -- you're asking me now is that the summary?  I'm

23   sorry.  I got lost at the end.

24        THE COURT:  Let me just give you the floor and say

25   this:  The defense says that the statement -- the partner,

```
 1    Anthony Sereno, says he was never a partner.  The person who
 2    is supposed to be the partner says he was never a partner.
 3    The defense says that's false and misleading.  I know you
 4    disagree with that.  Okay.
 5            MR. McDONALD:  Yes, sir.
 6            THE COURT:  But explain to me why the defense is
 7    wrong to even be citing this, at all.
 8            MR. McDONALD:  Okay.  And we -- I'm going to point
 9    you to the response, 'cause we spent a lot of time laying it
10    out.  Give me a minute and I will just point you to it.
11            THE COURT:  I'd prefer it in your own words.  I
12    wasn't able to digest it in the easiest way possible.
13            MR. McDONALD:  Okay.  Can I have a brief
14    indulgence, sir?
15            THE COURT:  Sure.
16            MR. McDONALD:  Thank you.  Defendants cite portions
17    of the transcript -- I'm reading from our filing,
18    ECF No. 594.
19            THE COURT:  Hold on.  What page are you on?
20            MR. McDONALD:  Let's see.  Page 30 -- so it says
21    number 30 on the bottom of the page.
22            THE COURT:  I have read this a couple times, but in
23    your own words, tell me why is it unfair for the defense to
24    be citing this part of the Grand Jury discussion?
25            MR. McDONALD:  Because page 22 -- I'm just going to
```

1    read back what it says, and you're not persuaded by it,

2    but --

3             THE COURT:  I didn't say -- I'm trying to

4    understand it.  I want to give you the best shot to explain

5    it to me.

6             MR. McDONALD:  On pages 22 through 26, we

7    reference, did the people at -- and I have it -- I have it

8    bolded here.  Did people -- it is on page 31 of the

9    government's ECF No. 594, that prior to the portion that they

10   are citing, there's a long back-and-forth about Rehmann

11   personnel asking for documentation and operating agreements

12   and partner agreements.  And then when you keep reading down

13   the transcript, I'm summarizing what we have covered, to say

14   that they didn't get documents referencing the documents that

15   they requested on earlier pages in the transcript.

16            THE COURT:  I'm with you a hundred percent up until

17   the point that you add in this point about what you believe

18   Sereno said.  The testimony that you cite, in bold, on

19   page 31 and 32 of your response, does talk about a lack of

20   follow-up documentation.  I agree with you.  Okay.  But when

21   you took it upon yourself to speak to the Grand Jury, you

22   didn't limit your comments to this lack of documentation when

23   you were telling them why they could find that

24   Rachel Locricchio made a false statement.  You added that

25   another reason they could find that Rachel Locricchio made a

1   false statement was, in your words, "The person who's

2   supposed to be the partner, Anthony Sereno, says he was never

3   a partner."

4          Didn't you offer that as a reason in the context of

5   Count 10, to find that she made a false statement?

6          MR. McDONALD:  Yes, but I thought there are -- yes.

7          THE COURT:  Okay.

8          MR. McDONALD:  But I thought their argument that we

9   were responding to is, the government misled the Grand Jury

10  by saying there are no documents showing a partnership.

11         THE COURT:  You know what, they did make that

12  argument, and I'm not focused on that argument.  I'm focused

13  on the last part of the sentence here, which is your

14  statement that the person who's supposed to be the partner

15  says he was never a partner.

16         MR. McDONALD:  Okay.  But --

17         THE COURT:  They criticize you for that, too.  I'm

18  only talking about this part of the criticism.  And what I'm

19  getting at is, if I find that statement to be false, it seems

20  to me that there's a serious position, if not the correct

21  argument, that this false statement was one of the pieces of

22  evidence that was used to secure an indictment on Count 10.

23         MR. McDONALD:  On Count 10?

24         THE COURT:  Yes.

25         MR. McDONALD:  The government has dismissed

1  Count 10.

2          THE COURT:  I understand.

3          MR. McDONALD:  Okay.  That's the false statement

4  charge; is that correct?

5          THE COURT:  Yes.

6          MR. McDONALD:  Okay.

7          THE COURT:  Right?

8          MR. McDONALD:  I understand what -- you are making

9  a different argument than the argument that they make.  Now I

10 understand.  You are not arguing.

11         THE COURT:  The argument I'm making is this -- the

12 argument -- let me play the role of the defense, so that I

13 can give you a full opportunity to respond to what I

14 understand to be their full-throated argument.  Their

15 argument is that it is the statement, the person who's

16 supposed to be the partner says he was never a partner.  They

17 say that is false on this record, and at absolute best, they

18 say it is grossly misleading, and they say it was misconduct

19 for you to elicit that testimony from Mirabella, and

20 compounded misconduct for you to personally highlight that to

21 the Grand Jury.

22         Give me your best response to that, which is really

23 their fundamental attack here.

24         MR. McDONALD:  That the government was not

25 committing misconduct because we had previously heard the

 1    statements from Sereno, in September of 2022, and then he

 2    testified consistently, in July of 2023.  And although it is

 3    not transcribed exactly as Mirabella said it, he said words

 4    to those effect, Mirabella did hear them, and he was honestly

 5    saying what he had honestly heard Sereno say.  That's the

 6    same argument that you've heard from the government already,

 7    though.

 8           THE COURT:  Okay.  Hold on.  All right.

 9    Mr. McDonald, you have been very patient with me in answering

10    my questions.  I want to make sure that I give you an

11    opportunity to highlight any other points you want to

12    highlight on the motion to dismiss.

13           MR. McDONALD:  Sir, we will rely on our submission.

14           THE COURT:  Okay.  Thank you.  I appreciate your

15    thoughts.

16           Mr. Nemeth, if you -- when you come up, I would

17    like you to confine your comments to the topics that I

18    addressed with Mr. McDonald.

19           MR. NEMETH:  Yes, Your Honor.  Where do I begin,

20    Your Honor?

21           THE COURT:  How about with this:  Let's say I agree

22    with you, with all of the factual points that you made.  What

23    case says that I have the authority to exercise supervisory

24    powers to dismiss an indictment for what happened here?

25

```
 1          MR. NEMETH:  We believe Nova Scotia's progeny gives
 2   the Court authority.  There is -- if not this situation,
 3   Your Honor, then the Grand Jury system, the Constitutional
 4   protections are nonexistent.  It's a completely abusive
 5   situation.  Knowingly false representations were made to the
 6   Grand Jury by the prosecution team.
 7          THE COURT:  What -- what is your response to
 8   Mr. McDonald's argument that it wasn't knowingly false
 9   because Mirabella heard Sereno say -- prior to Mirabella's
10   August 2023 testimony, Mirabella heard Sereno say what's
11   documented in the March 2024 302?
12
13          MR. NEMETH:  There's no evidence to support that.
14   First of all, Your Honor, and I've struggled with this.  To
15   call Agent Mirabella's testimony testimony is generous.
16          THE COURT:  Look, you're not getting anywhere on
17   that line of argument.  There's a million cases that say the
18   form of the Grand Jury testimony doesn't matter, the hearsay
19   doesn't matter.  That's why I'm asking you to confine your
20   comments to what I'm talking about here.  You've got a
21   potential ground to victory here, but I have hard questions,
22   and I need answers to these questions.
23          The -- what case -- even if I'm horribly offended
24   and even if I share your view, what case says I can dismiss
25   on what we have here?  Williams says that there's no
```

1    obligation to present exculpatory evidence.  Does this go

2    beyond a mere failure to present exculpatory evidence?

3

4          MR. NEMETH:  Yes, it does, Your Honor.  Exculpatory

5    evidence would be -- you know, there's A and there's B, and

6    another person said something.  Here there's actually

7    fabricated testimony, and the logical chain of events here is

8    that when the defense counsel raises this issue about, well,

9    where is this coming from, that Anthony Sereno is now saying

10   he was never a partner and/or owner of Gravity Imaging, the

11   government runs out and now we have an interview unrecorded.

12         THE COURT:  In Sereno's trial testimony that

13   Mr. McDonald pointed to, I think it was Mr. Hammoud said, is

14   Gravity Imaging Cory Mann's company?  And he said yes.  So

15   why can't Mirabella, thereafter, testify as he did?

16

17         MR. NEMETH:  It's not what he testified to,

18   Your Honor.  First of all, Mr. Sereno -- and, Your Honor, you

19   took basically my words out of my mouth, from my binder

20   there.  When you go back to the 2022 Grand Jury testimony,

21   and it's illuminative because that's one of the things the

22   government relies upon in their 50-page response.  Look at

23   the 2022 -- I'm sorry, the 2020 Grand Jury testimony when

24   Mr. Sereno is laying this out right before his plea, and

25   Mr. McDonald tells him, hey, you have to volunteer things

1  here, and if something's not clear to you, you have to let me
2  know.
3      THE COURT:  I'm talking about in 2022 or 2023,
4  Sereno testifies at the trial, where Mr. Hammoud was the
5  lawyer.  Mr. Hammoud asks him a question about Gravity, and
6  he says, that's Cory Mann's company, right?  And Mr. Sereno
7  says yes.
8      So my question to you is, that from that point
9  forward, why is it false when Mirabella testifies that Sereno
10  said he wasn't an owner and it was all fake?
11
12      MR. NEMETH:  Because the question in
13  cross-examination has no context to time, place, what have
14  you.  That is Cory Mann's company in 2023.
15      THE COURT:  I think the question was in the past.
16
17      MR. NEMETH:  And some part of it, because he's
18  still collecting the receivables.  This is where the
19  government is dancing on this head of a pin.  And, you know,
20  Your Honor talked about that words have precision.  What
21  could be more imprecise than what's going on here, that
22  Anthony Sereno allegedly changes his sworn testimony, that
23  when I testified to these things at the Grand Jury and I've
24  been the government's star witness and I've been relied upon,
25  well, it's none of those things that I meant.  And I never

 1    went outside and talked to my lawyer of 35 years and said,

 2    you know, I was really confused by this, and '21 goes by, '22

 3    goes by, and we get into 2023 and a new theory appears of,

 4    oh, it turns out that there's not a partnership here.  And I

 5    think what's illuminative of this, Your Honor -- and I don't

 6    know if the Court has had an opportunity to look at some of

 7    the government responses from the other motions in limine

 8    that have been filed, but the government says, well,

 9    Mr. Sereno now says, oh, I agreed to do that, and they call

10    him Defendant Sereno, because it was part of Cory Mann's plan

11    to defraud the IRS.  They just add these things in now.

12            Agent Mirabella, who I note is not here today, when

13    we look at August of 2023, that moment in time, and he's

14    answering the questions, sometimes inconsistently, because

15    they're not factually accurate questions, but Mr. McDonald

16    corrects it -- or tries to.  It is not just Agent Mirabella

17    that says it, it's Mr. McDonald that says it.  Oh, he, Sereno

18    says he was not an owner ever.  Meanwhile there are -- there

19    is testimony to the contrary.  And the only document that

20    supports it is a 302, seven months later, that bolsters

21    it -- bolsters that argument.

22            THE COURT:  What about the other part of Sereno's

23    trial testimony the government cites, where he says he's a

24    partner with Gravity?

25

1          MR. NEMETH:  So Your Honor is talking about these

2    prepositions.  At the same time the government says

3    Mr. Sereno doesn't understand, he's not a sophisticated

4    businessman, he doesn't understand these concepts.  But,

5    Your Honor, I'd like to point to something, and I think this

6    is -- this is on point.

7          So in the government's response at tab -- at

8    Exhibit V, Attachment V, as in Victor, we have a Title III

9    intercept, and the government attaches this.  And it says,

10   IC, incoming call, from Anthony Sereno to JA, John Angelo.

11   The government's own agent -- before I quote the

12   conversation -- summarizes it this way:  According to JA,

13   Mann just provided the numbers he's looking at for

14   receivables for Gravity Imaging.  JA, Mann and Sereno have

15   been discussing the rabbi's proposal to buy them out and take

16   over Gravity.  Buy them out.

17         And then the conversation -- John Angelo answers

18   the phone:  Yeah.

19         Sereno:  All right.  Go slow and try to explain

20   this to me.

21         John Angelo:  All right.  So we've got 3.7 million

22   in receivables.

23         Sereno:  That's me, me, and you; or me, you and

24   Cory?

25         John Angelo:  That's what the account receivable is

1    there.

2            Sereno:  That's our money?

3            It's yeah -- is this Angelo now:  It's -- yeah, the

4    whole -- the business.

5            Sereno:  But most of it is ours, right?

6            JA:  What do you mean, most of it's ours?

7            Sereno:  Okay.  3.7 is --

8            JA:  That's the accounts receivable.

9            Sereno:  Well, we're the only ones sending there,

10   right?

11           JA:  Yeah.

12           Sereno:  So we get 40 percent of that.

13           An then they go on -- this is what the government

14   highlights.

15           John Angelo:  Right.

16           Sereno:  Okay.  All right.  Just so I understand.

17   I'm not questioning you on anything.  I'm just --"

18           And then we go down.

19           "John Angelo:  So what Cory's saying?  Okay.  Let's

20   factor -- let's just tell the rabbi that the whole caboodle

21   for 1.5.  Give him the keys.  He could do whatever he wants

22   with the receivables.  Keep them, factor them, you know what

23   I mean?

24           Sereno:  Uh-huh.

25           JA:  And Cory will stay on and run it for 200 grand

1    a year, if he wants.

2            Sereno:  Uh-huh.

3            JA:  And we'll get a marketing agreement with him.

4            Sereno:  Okay.  Do you want me -- what do you want

5    me to do?  Do you want me to call the rabbi and meet with

6    him?

7            They are talking about dividing up the business.

8    That is irreconcilable with this idea of a fake partnership.

9    We're dividing up the receivables.  If anything, there's

10   confusion on -- it was divided 50/50, not 60/40.  The

11   government in their pleadings that have been filed in the

12   motions in limine are now saying, well, the case isn't about

13   partnership, but the indictment says the fraud is falsely

14   claim that Gravity Imaging was a partnership.

15           The prepositions "in," "with," it's all dancing on

16   the head of a pin here.  I think Your Honor summed it up

17   best, the prosecution's in too deep here.

18           THE COURT:  No.  I was summing up your position.

19

20           MR. NEMETH:  I'm sorry.  I apologize.  You are

21   summing up our position.  They are in too deep here.  It's 42

22   months since the indictment, 42 since the indictment.  I

23   don't know how long prior to the investigation?  I think

24   there might have been a target letter in 2018 or something.

25   And this is where we are now, that, well, the latest

```
 1    testimony is that there's a new theory here, and the case
 2    isn't about partnership but the fraudulent is partnership,
 3    and Anthony just says he never was a partner, it was a fake
 4    partnership.  Yet here they are -- this isn't my attachment,
 5    Your Honor, this is the government's attachment from their
 6    wiretap where Anthony Sereno is discussing, in 2017, the sale
 7    of the business that he owns part of.  And the government
 8    agent summarizes it that they are looking at buying them out.
 9               THE COURT:  All right.  So you believe that if it's
10    relevant to this motion, it is relevant because you believe
11    it shows that at least, at some point, the government
12    believed they were co-owners and the government, to get an
13    indictment, presented testimony to the opposite?
14
15               MR. NEMETH:  Absolutely.  The government brought
16    Anthony Sereno in to the Grand Jury just a few -- a week or
17    two before his plea agreement, which I also note as a
18    sidebar, when you read the plea hearing, Mr. McDonald did
19    most of the talking there, too.  Mr. Sereno says, didn't file
20    my taxes.  But the concept here that you are a partner,
21    Mr. Sereno, couldn't have been clearer.  What else can we
22    rely on than clear language here?  We are now in a Grand Jury
23    setting and --
24               THE COURT:  Look --
25
```

1      MR. NEMETH: -- for them to just say, well, forget

2  all of that.

3      THE COURT:  It is only relevant for today's

4  purposes, that might be a great exhibit at trial, but it is

5  only relevant today if it somehow suggests that the

6  government proceeded in bad faith in front of the Grand Jury

7  that issued the most recent indictment.

8

9      MR. NEMETH:  Absolutely, Your Honor.  And the fact

10  of the matter is, when Your Honor was questioning

11  Mr. McDonald at the beginning, about 302 reports or the MOIs

12  and the importance of them, what could be more important

13  than, oh, Mr. Sereno now, I guess, years after the fact has

14  come in and said, you know what, it was all a fake

15  partnership.  Let, me tell you everything that's going on

16  here, that we wouldn't write a 302 report on that.

17      We have been inundated with millions -- millions of

18  documents and pieces of paper and memorandums of interview

19  and so forth.  And then to say, well, something like this

20  doesn't fit in.

21      I think, Your Honor, and I think the record

22  supports clearly, as we started to delve into this new

23  iteration, we called this out.  Where is this with

24  Anthony Sereno and fake partnership and I was never a

25  partner.  That is contrary to what we have laid out in our

 1    pleadings.

 2           THE COURT:  Look, the government's position is,

 3    yes, we believed this was a real partnership for a while, but

 4    we didn't have access to the key evidence.  We got the key

 5    evidence and the key evidence persuades us that it was a fake

 6    partnership.

 7

 8           MR. NEMETH:  It's absolutely not credible.  That is

 9    not a credible argument, and frankly, it is beneath the

10    Department of Justice Tax Division to be taking a position

11    like that.

12           Let's juxtapose this for just a moment.  We indict

13    a CPA with 20-some years experience at a major firm because

14    we look at a note and say, you didn't volunteer something to

15    us, you didn't tell us something, and frankly, misled the

16    Grand Jury as to why they don't have e-mails from Rehmann.

17           And to take the view that -- first of all, Rehmann

18    hired Warner Norcross, a major competitor of Varnum, a

19    very -- a highly reputable firm.  There is nothing in the

20    record to suggest that Rachel Locricchio did not cooperate

21    with Rehmann.  And, in fact, if these notes were what the

22    government thought they were, the easiest thing for her to do

23    was to get rid of them.  She's perhaps the most honest person

24    in the this whole case.  She turned things over.  She told

25    her lawyer something in confidence.  And the government plays

1   some sort of gotcha, changes theory, tries to salvage a case.

2   I don't understand their obsession with Cory Mann, but it's

3   there, but then Anthony Sereno gets a pass.  Anthony Sereno

4   is the one testifying at the Grand Jury and they are like,

5   oh, well, he now believes that he said something wrong.  But

6   I looked to the timing of this and there is no 302 report,

7   there is no corroboration of anything about all of these

8   details of Mr. Sereno, until the government is notified by

9   the defense counsel that we intend to file a motion looking

10  for something.

11          And as the Court commented in the April 8th

12  hearing, that Mr. Hammoud had noticed this trend

13  before -- this is not just an isolated incident.  There is a

14  problem, lo and behold, we get a witness.  Mr. Sereno has

15  zero credibility.  Now, that's a judgment call of the people,

16  if they want to continue to go on with him.

17          But Your Honor asked Mr. McDonald about -- on

18  page 53 of the hearing transcript, "Where did Mr. Sereno

19  express this view about it being a fake partnership?"

20          Mr. McDonald says, "In a jumble of words that do

21  not make any sense in 302s.  If I could have quoted it and

22  put it in a memo, I would have.  It does not exist in a way

23  that you will understand."

24          Apparently, we are now delved into -- I don't know

25  if "inside baseball" is a fair term here.

1            THE COURT:  Maybe he just thinks I'm a dumb ass.

2

3            MR. NEMETH:  I doubt that, Your Honor.

4            THE COURT:  I wouldn't be so sure.

5

6            MR. NEMETH:  But we are now here, as a defense, and

7    when you look at this and say, well, what's this case about?

8    I'm -- I'm kind of out of words.  I don't know what the case

9    is about anymore.  The indictment says one thing about fake

10   partnerships and the pleadings that have come in, including

11   the motions in limine, say the case isn't about partnership,

12   it's not about it.  The Bill of Particulars, which is up for

13   later, says we can't identify anything else on Mr. Mann's

14   return.  Well, this is it, and it says, oh, they shouldn't

15   have filed a partnership return.

16            I will submit to the Court, we are sort of in this

17   trick box situation now, because if Mr. Mann would have filed

18   a Schedule C, they would have indicted him.  They would say,

19   well, you're talking about partnership here, you are

20   splitting profits under Section 761 of the Internal Revenue

21   Code, that's a partnership.  They are just trying to hold on

22   to the case.  And frankly, the comments of Mr. McDonald to

23   the Grand Jury were somewhat gratuitous at that point.  They

24   weren't specifically -- he just adds them in; oh, by the way

25   you should know.  There was no -- at least if there would

1    have been a 302 report, you could point to it and say, well,

2    maybe they should have provided some exculpatory evidence,

3    it's at least grossly misleading to the Grand Jury, and we

4    could look at that standard about grave concern and so forth.

5            That's not what happened here.  Three times -- two

6    or three times, Mr. McDonald volunteers that, as to drive

7    home the point.  What Mr. Mirabella just says is yes, yes,

8    yes, yes, yes, yes.

9            So when you look at the -- when you look at the

10   record of this indictment, and I will point out that when we

11   filed our motion and we had the hearing on April 8th, we

12   thought we were most of the way home, but you don't know what

13   you don't know, because Grand Juries operate in secrecy.  And

14   then when you shed light on it, it might have been, whoa, I

15   didn't realize there was all of this other evidence, but what

16   came out of it was a quarter-inch or half-inch of documents

17   with mostly mugshots and back to talking about stolen police

18   reports and basically just polluting the field for the Grand

19   Jury.

20           There's absolutely no fairness to this process, but

21   it goes beyond that, that the Grand Jurors are told things of

22   fact that there really is no record of or evidence to

23   support, certainly the extent or context that was presented

24   to them as fact.  Hey, you should know the partner says it

25   wasn't a real partnership and I wasn't part of it.  That's

 1   not the same thing as saying that Gravity Imaging is

 2   Cory Mann's company.  That is not even remotely the same

 3   thing, particularly for someone the government has labeled,

 4   on multiple occasions, as unsophisticated.  And certainly

 5   Mr. Abed (sic) wasn't questioning him as to that point in his

 6   cross-examination in that case.  But when we get to the crux

 7   of it, oh, we are going to indictment someone, paragraph 104,

 8   Defendant Cory Mann falsely claimed that Gravity Imaging was

 9   a partnership, that's the third superseding indictment.  So

10   that's the issue.  He falsely claimed it was a partnership.

11           Well, what could be more compelling to a Grand Jury

12   than to say, you should know that the other person who

13   controlled the entity --

14           THE COURT:  I get the point.

15

16           MR. NEMETH:  -- says that he wasn't.

17           I really don't have much more to say on that point.

18           THE COURT:  Before I hear from Ms. Locricchio's

19   counsel, I forgot a couple questions for Mr. McDonald.

20           Do you mind coming back up, Mr. McDonald?

21

22           MR. NEMETH:  Thank you, Your Honor.

23           THE COURT:  Mr. McDonald, do you believe that

24   Mr. Sereno's January 2020 testimony to the Grand Jury, where

25   he said he was not an owner, and his statements in the

1  proffers that he was not an owner, do you agree that that's

2  exculpatory evidence?

3          MR. McDONALD:  Say the date again?  I'm sorry.

4          THE COURT:  The Grand Jury testimony, where he says

5  he is an owner, I think it was January 2020.

6          MR. McDONALD:  January 2020.

7          THE COURT:  And the 302s where he identifies

8  himself as an owner.  Do you agree that those are exculpatory

9  statements?

10          MR. McDONALD:  Yes, sir.

11          THE COURT:  Okay.  Do you agree that those

12  statements are directly contrary to the repeated allegation

13  in the third superseding indictment that Robin Street did not

14  hold an interest in Gravity Imaging?

15          MR. McDONALD:  Say that sentence again, sir.

16          THE COURT:  Yeah.  So in the third superseding

17  indictment, you guys allege several times that the falsity

18  was "Defendant Cory Mann falsely claimed that Gravity Imaging

19  was a partnership."  And do you agree that Mr. Sereno's sworn

20  testimony and his statements during the interview directly

21  contradicts that, at least on its face -- his statements on

22  their face?

23          MR. McDONALD:  Can I have -- can I have a moment?

24          THE COURT:  Sure.

25          (An off-the-record discussion was held

1    at 11:24 a.m.)

2         MR. McDONALD:  On their face with no explanation,

3    we agree, yes, sir.

4         THE COURT:  Okay.  Can you just explain to me why

5    you guys didn't go to the Grand Jury in August of 2023 and

6    explain to them that here's what we understand Sereno's

7    current position to be, that he was a fake partner?  But,

8    ladies and gentlemen, you should understand, we want you to

9    know, we're not hiding the ball here, he has previously

10   testified under oath that he was an owner, and he told us

11   that in interviews, and, ladies and gentlemen, we even

12   charged that in the three prior indictments, but we want you

13   to understand, here's the explanation for why he said that

14   and why we believed it and why we charged it, and it's

15   inconsistent to what we're asking to you do today, we

16   acknowledge it, but here's our very reasonable basis for

17   believing what we do today.  Can you share with me why that

18   wasn't part of the discussion with the Grand Jury?

19        MR. McDONALD:  Yes, sir.  First, I would note the

20   same Grand Jury heard the second and third superseding

21   indictments, and you can tell from their questions that

22   that's the case.

23        Second, I would note that rather than present the

24   exculpatory information in the way that you just laid out,

25   what we did was make sure the Grand Jury understood that

```
 1    Sereno had entered a felony plea, that he had a cooperation
 2    agreement, that he had a vicarious cooperation agreement with
 3    a loved one, and that his cooperation was contingent or had
 4    an effect on whether she was charged with anything.  That
 5    he --
 6              THE COURT:  I understand --
 7              MR. McDONALD:  Can -- wait.  Can --
 8              THE COURT:  -- you did disclose.  You put that in
 9    your papers.  I read that.
10              MR. McDONALD:  Can I --
11              THE COURT:  You have bullet points about everything
12    you disclosed, I appreciate and respect that, but that's not
13    the answer to my question.
14              My question is -- if the answer is because we made
15    a bunch of other disclosures, that's fine.  Is that the
16    answer?  I don't need to hear them again, I read them.
17              MR. McDONALD:  The answer is that we believe we
18    provided proper context for the Grand Jury to view anything
19    that had to deal with Sereno with caution, by providing the
20    things that we outlined, showing his criminal culpability and
21    his involvement in the scheme, and that we did not provide
22    the exculpatory information because we thought we had
23    provided enough context to protect the due process rights of
24    the defendants, certainly to view his testimony or anything
25    having to do with him with extreme caution.
```

*Motion Hearing • May 15, 2024*

1   THE COURT: Okay. That's all of my questions for

2   you at this point.

3   Does anybody want to say anything on behalf of

4   Ms. Locricchio at this point?

5   MS. KRIGER: Your Honor, just briefly.

6   THE COURT: Let me ask you, did the government

7   mislead the Grand Jury about Ms. Locricchio's handling of her

8   handwritten notes?

9   MS. KRIGER: Yes, and the Court's questions

10  appeared to pick up on this. They left the Grand Jury with

11  the false impression that Locricchio, herself, who was the

12  point person, was responsible for providing these notes. The

13  government relies upon a statement that says, oh, well, we

14  never have received her notes, like the actual notes, we've

15  never received them, but that's not what they said to the

16  Grand Jury. They said we haven't -- we didn't receive them

17  until after Rachel Locricchio was indicted. So they're not

18  talking about the actual, physical notes themselves. They're

19  not talking about any notes after January of 2018. They're

20  talking very specifically, and this is what they say, the

21  note -- the notes that were supposed to be produced in

22  January of 2018. And that makes sense, because the only note

23  that they say is significant is one that was taken or jotted

24  down in 2016, that refers to Gravity Imaging as an LLC,

25  taxed, then, as a Schedule C, in 2015. And they left the

1    Grand Jury with the false impression that Rachel Locricchio
2    was responsible for giving over those notes, and they were
3    not given over until May -- or after she was indicted, after
4    May 17th of 2023, which is demonstratively false.
5              THE COURT:  Okay.  Anything else you want to say?
6              MS. KRIGER:  Only in response to the Court's first
7    question, which was, what gives me the right -- what
8    authority provides the right to dismiss this case?  And the
9    *Bank of Nova Scotia* uses the harmless error standard,
10   essentially, to put it in very simple terms, because the law
11   here is very nuanced and complex, but the question is, were
12   the improprieties -- was the misconduct --
13             THE COURT:  *Bank of Nova Scotia* deals with the
14   level of error.  *Williams* comes after and deals with the type
15   of error that allows dismissal.  And in *Williams*, they said
16   failing to present exculpatory information to a Grand Jury,
17   that can't be the basis.  The basis for -- before you even
18   get to the question of prejudice under *Bank of Nova Scotia*,
19   you have to have a permissible ground to dismiss the
20   indictment, and it has to be a ground that's specified in
21   some rule or law or somewhere.  The Supreme Court said
22   exculpatory evidence, that's not the kind of rule.
23             And so why isn't the error here, if there is one,
24   exactly the error in *Williams*, that the court said I don't
25   have the authority to dismiss?

1          MS. KRIGER:  There's a footnote in *Williams*,

2    Your Honor, and I don't have it in front of me, but I

3    remember it -- from memory, I can recall it, where it says

4    but presenting perjured testimony is a basis for dismissal.

5          This was not just a failure to present exculpatory

6    evidence, Your Honor.  This was a deliberate injection of

7    perjury, of false statements into the record.  I agree with

8    the Court that --

9          THE COURT:  What is the evidence that at the time

10   McDonald elicited these answers from Mirabella and that

11   Mirabella gave them, that they both had the state of mind for

12   perjury?

13         MS. KRIGER:  Well, they knew that -- I -- they

14   certainly -- well, we'll go back to, I guess, to the reply

15   brief, which they now say they understood, although they

16   couldn't -- they couldn't put it into a 302, they understood

17   that what Sereno was saying was that there was a business

18   relationship between Robin Street Consultants and

19   Gravity Imaging, and that the business relationship between

20   Robin Street Consultants and Gravity Imaging was such that

21   Robin Street would provide marketing services and

22   Gravity Imaging would do the MRIs and then, together, they

23   would share the profits.  That is, as a matter of law, a

24   partnership, and that is why we emphasized that that

25   explanation actually makes the conduct more egregious,

```
 1  because they essentially lied to the Grand Jury in yet
 2  another two ways.  One is that, based on Sereno's statements
 3  alone, that the Grand Jury should find -- or must find that
 4  no partnership existed or the business relationship that
 5  existed should not be taxed as a partnership, and we know
 6  that is just, as matter of law, not true.  And I just find it
 7  completely not credible, or incredible, that the Department
 8  of Justice, the Tax Division could say, well, shucks, we
 9  didn't know the law, so this wasn't deliberate perjured
10  testimony.  We should have known the law, but we didn't.  I
11  mean, it's essentially a concession that Gravity Imaging was
12  in a partnership and the only conspiracy was to file a
13  false -- or to file a correct return, Your Honor.  I don't
14  see how they can possible defend this position.  And if
15  nothing else, still, they've ultimately conceded they can't
16  win this case, and they should have presented the correct
17  testimony to the Grand Jury in the first place.
18          THE COURT:  Okay.  Thank you.
19          Mr. McDonald, I want to make sure that you have an
20  opportunity to respond to any of these arguments.
21          MR. McDONALD:  Brief indulgence, Your Honor.
22          THE COURT:  Sure.
23          (An off-the-record discussion was held
24           at 11:33 a.m.)
25          MR. McDONALD:  Nothing further, Your Honor.
```

```
 1            THE COURT:  Do you mind if I ask you another
 2   question?
 3            Who among the chain of command at the Tax Division
 4   has seen the motion to dismiss?
 5            MR. McDONALD:  As far as I know, from my direct
 6   supervisor up to ethics personnel -- everybody, everybody.
 7            THE COURT:  Your supervisor's supervisor?
 8            MR. McDONALD:  The chief, my supervisor, my chief,
 9   up to the ethics person, and then I don't know what happens
10   after that.
11            THE COURT:  Okay.  All right.  I want to take
12   ten-minute break.
13            (Court recessed at 11:34 a.m.)
14                         _   _   _
15            (Court reconvened at 11:43 a.m.; Court, Counsel and
16            all parties present.)
17            THE CASE MANAGER:  All rise.  Court is back in
18   session.
19            THE COURT:  All right.  Mr. McDonald, I thought of
20   one last question I wanted to ask and forgot to ask.  Do you
21   mind coming back up?
22            We talked about March of 2024, when Mr. Sereno
23   explains the fake partnership issue, and that's documented in
24   that 302 that we saw.  And at least from reading the 302, it
25   appears that when he mentioned the fake partnership point, it
```

1  occurred to you that there was some tension between that and

2  his Grand Jury testimony, so you asked him about it.  Is that

3  what happened in 2024?

4          MR. McDONALD:  I'm sorry.  Say it again, sir?

5          THE COURT:  We are in March of 2024.  You have this

6  meeting with Mr. Sereno, and this is the meeting that's

7  memorialized in a more recent 302.  This is the 302 where it

8  references fake and fugazi, in quotes.  You know the one I'm

9  talking about?

10          MR. McDONALD:  I do.

11          THE COURT:  So in that 302, just reading

12  chronologically, it starts off by reporting this fake and

13  fugazi version of events from Mr. Sereno, and then it says he

14  was shown his Grand Jury testimony from 2020.  Do you recall

15  this part of the 302?

16          MR. McDONALD:  Yes.

17          THE COURT:  Okay.  So as I'm sitting there reading

18  the 302, it occurs to me that what might have happened is in

19  March of 2024, when Mr. Sereno relays this fake, fugazi

20  account to you, it occurs to you that this account is not

21  consistent with his Grand Jury testimony, so you guys ask him

22  about the Grand Jury testimony.  Is that what happened during

23  that meeting?

24          MR. McDONALD:  Did we show -- you are asking me if

25  we showed him his prior transcript when we meet with him in

1   March of 2024?

2           THE COURT:  I'm asking you an antecedent question

3   to that, which is, when he shares with you the version of

4   events that his -- this fake, fugazi version, at that point,

5   does it occur to you guys that that version is in, at least

6   some, if not obvious, tension with his prior Grand Jury

7   testimony, so you ask him, how does he reconcile the two?  Is

8   that just, mechanically, what happened at that meeting?

9           MR. McDONALD:  You're asking if all of this is in

10  sequence, is that what you're saying?  That he gave us the

11  fugazi thing and then we showed him the transcript, or did it

12  go the other way around?

13          THE COURT:  I'm just trying to understand, at some

14  point you show him the transcript.  Was it after he shared

15  with you the fugazi business, and you guys -- it occurs to

16  you that there's some tension between that and the Grand Jury

17  testimony.  Did that occur to you during that meeting?

18          MR. McDONALD:  I mean, I think -- can you give me a

19  brief moment, because I think this is memorialized in order.

20          (Brief pause in the proceedings at 11:47 a.m.)

21          MR. McDONALD:  So I'm looking at the 302 and --

22          THE COURT:  Hold on one sec.  Let me just join you.

23  I just have to find it real quick.

24          Okay.  So can you tell me how this occurred?

25          MR. McDONALD:  We showed him the transcript and

 1   asked for the -- for him to reconcile the inconsistency, and

 2   then he gave us all of that stuff that comes after that.

 3   The 302 is in order.  So we showed him tax returns and then

 4   we showed him his transcript.

 5            THE COURT:  What led you to show him the transcript

 6   and ask about the alleged -- the possible inconsistencies?

 7            MR. McDONALD:  We went over everything that he

 8   would testify to in the Cory Mann/Locricchio trial.

 9            THE COURT:  So let me get to the question I was

10   ultimately going to ask.  You have reported to me that in

11   this meeting of September 2022, that's the first time that he

12   shares this fake partner idea.  And my question to you is, at

13   that meeting, did you say, hey, Mr. Sereno, this conflicts

14   with what you previously testified under oath?

15            MR. McDONALD:  I understand.  No.

16            THE COURT:  Why not?

17            MR. McDONALD:  It didn't occur to me at that time.

18   When he said it, I didn't immediately recall his prior

19   testimony from 2020.

20            THE COURT:  Okay.  Thank you.

21            MR. McDONALD:  May I go sit down?

22            THE COURT:  Please.  I'm all set with you.

23            All right.  I'm going to give you an oral ruling on

24   this motion right now.  Just give me one second.  All right.

25            Let me start by outlining the legal rules that

1  govern this motion, because it seems to me a logical starting

2  point.

3          As the government points out in its papers, and as

4  the Sixth Circuit has said and the Supreme Court has said, my

5  two bosses, the dismissal of an indictment based on alleged

6  prosecutorial misconduct is really an extraordinary remedy

7  and it is reserved for only the most serious abuses of the

8  Grand Jury process.  So the standard is very high, and I'm

9  familiar with it.

10         The second legal rule is that dismissal is not

11  permitted, absent a showing of actual prejudice.  This is the

12  *Bank of Nova Scotia* holding.  It can't just be that a court

13  is offended by what happened, there has to be some showing of

14  actual prejudice.

15         The third point that I think is important here is

16  that the holding in *Williams*, that dismissal of the

17  indictment is not permitted solely on the basis of a failure

18  to present exculpatory evidence to the Grand Jury.  There

19  must be a violation of some established rule or statute,

20  including rules against the presentation of false evidence to

21  a Grand Jury.

22         And the fourth, the government has cited some

23  Sixth Circuit case law from the '80s that suggest that in

24  order to dismiss based on prosecutorial misconduct, there

25  first has to be a showing of some sort of a pattern of

1    Grand Jury abuse in the district.

2         The defendants argue that that standard, this

3    pattern requirement, doesn't survive the Supreme Court's more

4    recent cases, and I agree with that.  In the *Bank of Nova*

5    *Scotia* case, the Supreme Court focused on prejudice and that

6    was the focus, rather than some sort of a pattern.  And even

7    more to the point in the *Williams* case, the Supreme Court

8    said that dismissal is not appropriate unless there's a

9    violation of some established rule, but didn't suggest that

10   there's -- that if there is a violation of some established

11   rule, there has to be any sort of a pattern.

12        So in my view, those are the rules that govern

13   here.  And when applying those rules, I think it's important

14   to understand the factual background -- the part of the

15   factual background that's important to me in connection with

16   this motion, and I want to briefly review it.

17        The first point in time I want to start with is

18   September 25, 2018, Anthony Sereno gives a proffer.  There's

19   a 302 of the proffer in our record, at 578-3.  And in that

20   proffer, Mr. Sereno says that he, Mr. Angelo and Mr. Mann are

21   co-owners of Gravity, and he gives the percentages.

22        There's a proffer on April 29th of 2019, by

23   Mr. Sereno -- and I'm using the word, "proffer," it may be

24   interchangeable with "interview," but this is also

25   memorialized in a 302 at 578-4.  There's a reference again in

*Motion Hearing • May 15, 2024*

1  this 302 to Mr. Sereno reporting that he was a part owner of

2  Gravity with Mr. Mann.

3         Then Mr. Sereno appears before a Federal Grand Jury

4  in January of 2020, and the transcript of that testimony is

5  in our record at Docket No. 578-5. And at pages 25 to 26 of

6  that transcript, Mr. McDonald asks Mr. Sereno if he got an

7  ownership in Gravity. Mr. Sereno says yes. And Mr. McDonald

8  goes so far as to reference negotiations for an ownership

9  interest. And, again, Mr. Sereno confirms that he negotiated

10  to get and got an ownership interest.

11         Other parts of this transcript that are significant

12  to me are parts that I highlighted with Mr. McDonald in my

13  discussions with him, which are at the beginning of the

14  testimony, on pages 4 and 5, Mr. McDonald reminds Mr. Sereno

15  of his obligation to tell the truth. He tells Mr. Sereno to

16  speak up if he's confused. And at page 6 of the transcript,

17  reminds Mr. Sereno that he's obligated to volunteer answers

18  if my questions are in the area of something that you

19  understand. At the end of the testimony, on page 34,

20  Mr. McDonald again reminds Mr. Sereno that he can come back

21  and fix any testimony at a later date, if he reflects and

22  realizes that he gave a false or wrong answer.

23         Other parts of this testimony that are significant

24  to me are where Mr. Sereno did offer some elaboration on a

25  limited number of yes-or-no questions. At page 25 of the

1   testimony, he was asked a yes-or-no question and he gave a

2   four-line answer, with a qualification.  At page 31, he gave

3   another full sentence answer, with an explanation to a

4   yes-or-no answer, and he did the same thing at page 33, where

5   he gave a clarification that he was uncertain about a date.

6   And what that indicates to me is that all of this -- the

7   instructions to Mr. Sereno and his conduct during the

8   testimony, the record, objective evidence indicates to me

9   that he understood he was not limited to yes-or-no answers

10  and, in fact, was required to -- or at least was advised, on

11  the record, that he was required to volunteer information,

12  and I have no reason to believe that he couldn't or did not

13  understand that simple direction.

14          Turning then to September 20th of 2020, Mr. Sereno

15  gives another interview.  This is in our record at Docket

16  No. 578-6, and he reports that he and Mr. Angelo were bought

17  out of Gravity, a statement that, to me, could at least be

18  deemed consistent with the notion that he held an ownership

19  interest.

20          The next important date for me is

21  December 16th, 2020.  A Grand Jury returns an indictment, and

22  the indictment specifically alleges that, among other things,

23  Mr. Sereno held an ownership interest in Gravity, and I

24  believe that alleged ownership is among the factual bases for

25  the two false return charges against Mr. Mann that he failed

1    to account for that ownership interest.

2            In December of 2021, we have a superseding

3    indictment, and paragraph 20 repeats the allegation that,

4    among other things, Mr. Sereno held an ownership in Gravity.

5            We then have a Grand Jury appearance by

6    Special Agent Mirabella on March 2nd, 2022.  This is in our

7    record at Docket No. 578-11.  And Special Agent Mirabella

8    indicates that, at one time, Gravity was owned by, among

9    others, Mr. Sereno.  And during that testimony, Mr. McDonald

10   elicited from Mirabella that his answers were based on

11   documents he had reviewed; summaries of interviews, either

12   FBI 302s or IRS MOIs; and deposition transcripts.

13           There is another interview with Mr. Sereno, on

14   July 28th, 2022.  This is in our docket at 594-2.  In there

15   Mr. Sereno indicates that he and Mr. Angelo were "made" and

16   then "part owners" of Gravity.

17           And there is a September 1, 2022 interview that is

18   in our record at Docket No. 578-7, where Mr. Sereno indicates

19   that he became a partner "at Gravity," as a way to get

20   bonused-out.  And I regard "at Gravity" as consistent with

21   having an ownership interest.

22           By the way, when I'm recounting these 302s and

23   MOIs, I understand Mr. McDonald's point that they don't

24   purport to be transcripts or direct quotes, but I also take

25   his answer that they are the best effort of the authors to

1    accurately recount the substance of what was said.

2            The next date is the second superseding indictment

3    that's returned in May of 2023.  This contains the same

4    allegation that, among other things, Mr. Sereno held an

5    ownership interest in Gravity.

6            The next date for me is an e-mail dated

7    May 26, 2023, where a representative of Warner Norcross

8    reports to Mr. McDonald that the firm has found a scan of

9    Ms. Locricchio's notes, certain of them, on the system, and

10   that it appears to that person that the firm had neglected to

11   send the notes earlier.

12           The next key date for me is a June 6, 2023 meeting

13   involving Mr. Sereno, that is memorialized at Docket

14   No. 578-9.  During that meeting, Mr. Sereno reviewed all of

15   his prior reports of interviews, including 302s and MOIs, if

16   any.  He was given an opportunity to correct any statements

17   that were inaccurate.  He does make corrections, but he does

18   not make corrections to any of the points in his prior

19   interview reports indicating that he was an owner of an

20   interest in Gravity, at least at some time.

21           The next event that I want to focus on is

22   Special Agent Mirabella appearing before the Grand Jury that

23   returned the third superseding indictment on

24   August 16th, 2023.  And in that testimony, on page 20, which

25   is, among other places, in my docket at 578-10, pageID.13923,

1  Mr. McDonald and Mr. Sereno have the following exchange that
2  I want to make sure I quote into the record.  This begins at
3  line 15 on page 20 of the transcript.
4          Question:  "And have you heard Anthony Sereno tell
5  you and others that he understood he was not an owner of
6  Gravity Imaging ever?"
7          The answer is:  "Yes, yes."
8          Next question:  "Okay.  That he believed he was a
9  partner in the sense that he was a business partner who
10  received money for each time he solicited somebody using
11  stolen reports and sent an MRI?"
12          Answer:  "Correct."
13          Question:  "But not a partner such that he owned
14  half of an entity called Gravity Imaging?"
15          Answer:  "Yes."
16          And then on line 16 of page 21, Mr. McDonald again
17  asks question:  "And, again, Anthony Sereno has told you and
18  others he knows he never owned Gravity Imaging, that that's
19  not true?"
20          Answer:  "Correct."
21          On page 27 of the transcript, a Grand Juror raises
22  a question that references, "On paper, Anthony Sereno was
23  supposed to be part of a partner?"
24          And Mr. McDonald says, "Do you want me to ask the
25  agent about that?"

1    The Grand Juror says, "Yes, please."

2    And on page 28 of the transcript, Mr. McDonald asks

3 at line 5, "And do you understand that Anthony Sereno has

4 indicated he never was an owner of that entity, that this is

5 not a true document?"

6    Answer:  "Correct."

7    On page 26 of the transcript, Mr. McDonald was

8 talking to the Grand Jurors in the context of Count 10, and

9 he told the Grand Jurors, among other things, that:  "The

10 person who's supposed to be the partner, Anthony Sereno, says

11 he was never a partner."

12    The other parts of this transcript that are

13 relevant, though not quite on the level of what I just talked

14 about, are the references to Ms. Locricchio and her role in

15 gathering notes and what happened with her scanned note

16 of 2016, the note that the government regards as inculpatory,

17 because supposedly it's her acknowledging that she understood

18 Gravity was not a partnership.  And the questioning begins on

19 page 13, with Agent Mirabella identifying Ms. Locricchio as

20 the primary point of account contact, for the Grand Jury.  On

21 page 15 there are questions about subpoenas being issued for

22 handwritten notes.

23    As I indicated, I believe the reading of the

24 questions that are asked here are not that the subpoenas were

25 limited to documents created between 2018 and 2023, but that

1   the Grand Jury would have understood these questions to talk

2   about the subpoenas that were issued during that time period.

3        And I believe that when the questions from pages 14

4   through at least 17, are read in context and fairly read, I

5   believe that those questions reasonably left the Grand Jury

6   with the impression that Ms. Locricchio was responsible for a

7   failure to produce, in response to a subpoena, this note

8   from 2016 that the government ultimately obtained and that it

9   relies on now.  There was no mention made to the Grand Jury

10  that, as the government had been informed before this

11  testimony, Ms. Locricchio had sent notes in a notebook to

12  Mr. Lennon at the Warner Norcross firm.

13       The next date is the third superseding

14  indictment -- and I guess, before I move to that -- that's

15  returned by the Grand Jury, what's important to me is what is

16  not communicated to the Grand Jury that returns the third

17  superseding indictment.  And what is not communicated to them

18  is the sworn Grand Jury testimony that Mr. Sereno gave in

19  January of 2020, nor any of his prior interview statements,

20  where he indicated that he was an owner, nor his interview

21  where he had an opportunity to review his prior statements

22  and confirm their accuracy.  None of that information that,

23  to me, is not just garden variety exculpatory information.

24  This is -- this evidence includes sworn testimony that goes

25  to the core allegation and fundamentally contradicts the core

1    allegation underlying the charges against Mr. Mann and

2    Ms. Locricchio, is that a false claim that Gravity was a

3    partnership. All of the prior statements by Mr. Sereno that

4    I identified and that were not shared with the Grand Jury

5    directly undercut that, and so do the three prior Grand Jury

6    indictments.

7         Now, Mr. McDonald points out that the same

8    Grand Jury returned the third indictment and the third

9    superseding indictment, so indictments three and four, but I

10   don't see any effort to bring to their attention this

11   contradiction. But the much more important point, rather

12   than the change in the government's theory, is the failure,

13   in my view, to highlight this absolutely critical exculpatory

14   evidence.

15        The next date here is the March 21st, 2024 meeting,

16   where Mr. Sereno explains that he was -- that he never

17   believed he was an owner of Gravity. That the ownership

18   agreement was fake or fugazi. And he offers an explanation

19   for why his Grand Jury testimony was inconsistent with that.

20   On the basis of the evidence before me in the record, I don't

21   think that that explanation can reasonably be believed.

22        Mr. McDonald says that he had some conversation

23   with Mr. Sereno's attorney, off the record, that is -- the

24   contents of which is both unclear to me and unsatisfying, but

25   the objective evidence on the record would, to me, compel the

```
 1   conclusion that no reasonable person could believe the
 2   explanation that Mr. Sereno offered in 2024.  Also -- so
 3   those are, to me, the key facts.
 4          So when I apply the legal rules here, to me this
 5   isn't simply a case of a failure to present critical
 6   exculpatory evidence, because if it was just that, I think
 7   Williams would preclude me from granting the motion.
 8          I regard this case as going a clear level further
 9   and one involving the presentation of false evidence, not
10   just a lack of exculpatory evidence.  And to me, the false
11   evidence is the words and questions that were used in the
12   colloquy between Agent Mirabella and Mr. McDonald in the
13   Grand Jury in August.  The questions were specifically worded
14   about whether the agent had heard Mr. Sereno tell people that
15   he understood he wasn't an owner of Gravity, and tell people
16   that he believed he was a fake partner, and tell people that
17   he never owned Gravity Imaging.  And on the record before me,
18   the reasonable conclusion is that that is false.  That
19   Mr. -- that Agent Mirabella, on the record before me, the
20   most reasonable conclusion and most reasonable inference is
21   that he did not hear Sereno say the words that were
22   attributed to him in the Grand Jury testimony.
23          And the way that I get to that inference is I start
24   with the questions that I began this hearing with, about how
25   these procedures work and what goes into 302s.  And in my
```

1    view, the answers from Mr. McDonald support the inference

2    that if Mr. Sereno had ever said, prior to

3    Special Agent Mirabella's testimony, that he was not an owner

4    of Gravity Imaging, the record before me indicates that that

5    would have been considered an important piece of information,

6    and important pieces of information are included in reports

7    of interviews.  And so I think the evidence supports an

8    inference that Mr. Sereno did not say these words.

9         I have offered the government an opportunity to

10   identify, for me, evidence in the record before me that

11   Mr. Sereno did say these words, and I went through that with

12   Mr. McDonald in my colloquy with him, and I don't believe

13   that any of the evidence cited by the government could

14   support an inference that Mr. Sereno told anybody he was not

15   an owner or a partner.

16        The government cited three pieces of evidence.  One

17   was a March 2024 302 report, but as Mr. McDonald candidly

18   acknowledge, that came after Special Agent Mirabella's

19   testimony, so that can't render the testimony true.

20        The other 302 that Mr. McDonald pointed to was a

21   September 2022 interview with Mr. Sereno, but in my colloquy

22   back and forth with Mr. McDonald, I explained why I don't

23   believe there's anything in that that supports the words

24   attributed to Mr. Sereno here, which are important and

25   significant words about what he understood.  That, to me,

1    appears nowhere in this September 2022 302.

2            The closest we get to this is the trial testimony
3    of Mr. Sereno in the -- in one of the prior trials that I
4    had, where Mr. Sereno refers to himself as a partner with
5    Gravity, and at one point says that Gravity was Cory Mann's
6    business.  But, to me, those statements are a far cry from
7    the specific words that Mirabella testified came out of
8    Sereno's mouth about what he understood, in terms of being an
9    owner and believing he was never a true owner.  The testimony
10   at the trial, that the government relied on, at best, would
11   require a series of inferences about what Mr. Sereno may have
12   believed, and the testimony about Gravity being Cory Mann's
13   business is not tied down to a particular date and is not
14   inconsistent with the notion that Mann ran it and was the
15   majority owner, so that doesn't support an inference that
16   this testimony by Special Agent Mirabella was truthful.

17           Indeed, as I indicated, I believe that, on the
18   record before me, given the government's answers today, that
19   the reasonable conclusion -- the most reasonable conclusion
20   is that the testimony attributing these specific words to
21   Mr. Sereno was false.

22           On top of that, aside from my view that this is
23   false, in my view, the way this matter was presented to the
24   Grand Jury was grossly misleading.  The -- heading into this
25   testimony in August of 2023, the government had sworn

 1   testimony from Mr. Sereno that directly and unambiguously, on

 2   its face, contradicted what was reported to the Grand Jury.

 3   It had Sereno confirming, many times, that what was reported

 4   to the Grand Jury is the opposite of what he believed, and

 5   the government did not bring that to the Grand Jury's

 6   attention.

 7          While there is no general obligation to share

 8   exculpatory information with the Grand Jury, the fact that

 9   this was so grossly misleading, the omission of this

10   evidence, on top of the fact that the testimony was false, to

11   me, is something that weighs in favor of a dismissal here.

12          Having reviewed the policy of the Department of

13   Justice, which is included in the materials

14   at 17 -- it's -- they have a policy on the presentation of

15   exculpatory evidence.  It is 9-11.233.  It acknowledges that

16   the government is not required to present exculpatory

17   evidence, but says that when a prosecutor conducting a Grand

18   Jury inquiry is personally aware of substantial evidence that

19   directly negates the guilt of a subject of the investigation,

20   the prosecutor must present or otherwise disclose such

21   evidence to the Grand Jury before seeking an indictment.

22          In my view, that policy was not complied with here.

23   On its face, Mr. Sereno's statements directly negate the

24   guilt, because they undermine the core of the government's

25   case.  And the explanation that Mr. Sereno gave for why you

1    should understand those statements differently than their

2    plain language is, to me, not one that could be reasonably

3    accepted on this record, for the reason that I gave.

4           So in my view, a prosecutor looking at this

5    evidence would have done exactly what I asked, or should have

6    done, under the DOJ's own policy, exactly what I asked

7    Mr. McDonald if he did, which was inform the Grand Jury about

8    this.  Mr. McDonald respectfully disagreed with my view and

9    said that he thought that the government's disclosures to the

10   Grand Jury were sufficient.  I respectfully disagree with

11   that.

12          It's one thing to tell a Grand Jury that they

13   should take, with caution, evidence that is attributed to

14   Mr. Sereno.  It's an entirely different thing to tell the

15   Grand Jury that Mr. Sereno has testified, under oath,

16   contrary to what the Grand Jury is being told at the time and

17   has confirmed in interviews, several times, a version of

18   events that is contrary to what the Grand Jury is being told

19   at that time.  So I found that aspect of the government's

20   presentation to be misleading and not consistent with DOJ

21   policy.

22          I also think that the handling of the matter with

23   respect to Ms. Locricchio and the notes and the scanning in,

24   that testimony that I reviewed earlier, I thought that was

25   presented in a materially misleading way, that was designed

1    to cast aspersions on Ms. Locricchio.  There may be plenty of

2    reasons to believe in the government's view that she is

3    guilty of an offense, but the way that this was presented, to

4    me, created an inaccurate view, and the view was specifically

5    that she somehow withheld the note that the government finds

6    inculpatory.  That's the inference that I think was thrown

7    out by the government and that the Grand Jury could well have

8    made.

9         I want to make clear that while I reference the

10   DOJ's policy, that's absolutely not the basis on which I'm

11   dismissing this, so let's be clear about that.  The law is

12   clear that the DOJ's failure to comply with their own

13   policies is not a basis for dismissal, and that's not the

14   grounds for kicking it.  It just adds additional context to

15   what is going on here.

16        And the next question is, as I indicated, that I

17   believe I have to answer, is the question of prejudice.  Is

18   there a strong reason to believe that the testimony that I

19   found both to be false and grossly misleading led to this

20   indictment.  And I think the answer there is, to me,

21   yes -- an unequivocal yes.

22        While the government certainly presented other

23   evidence, for instance, Rehmann documents, that the

24   government says supports its theory here, the whole point of

25   bringing out this evidence and highlighting it for the jury

1    and coming back to it again and again, and addressing it in

2    response to a question from the juror, tells me that the

3    evidence I'm concerned about here unquestionably had a

4    significant impact, at least in my view, on the jury's

5    decision to return an indictment.

6              I want to indicate that not only do I believe that

7    the testimony elicited from Special Agent Mirabella brought

8    out what I believe to be a false point that Sereno told

9    somebody, I think it's additionally significant that

10   Mr. McDonald emphasized or highlighted that evidence again,

11   on page 26 of the Grand Jury testimony, when he said that,

12   among other things, the person who is supposed to be the

13   partner, Anthony Sereno, says he was never a partner.  I

14   understand that was in the context of Count 10, but when you

15   read the reason that Mr. McDonald was highlighting that, he

16   was trying to underscore that there was no basis for a

17   conclusion that Gravity was a partnership, and that, of

18   course, bleeds into the other counts.  So it is just more

19   conduct before the Grand Jury that, to me, creates a false

20   and misleading impression.

21             So for all of these reasons, I'm going to grant the

22   defendants' motion and dismiss the indictment that is set to

23   be tried, I guess, in a couple weeks.

24             The one issue that I have not -- I'm not prepared

25   to rule on now, and I would invite supplemental briefing on

1  this, is whether the dismissal should be with or without

2  prejudice.  There's a body of law on prosecutorial misconduct

3  findings that lay out a series of factors to be considered

4  when deciding whether a dismissal should be with or without

5  prejudice.  That was not taken up in the briefing.  I know

6  it's an issue, but I haven't looked at it myself.  So before

7  I make a final decision on the form of the dismissal here, I

8  would ask for some supplemental briefing.

9           Since it's the defendants' motion, how long do you

10 want to file those briefs?

11          MR. THOMPSON:  Two weeks, Your Honor.

12          THE COURT:  All right.  How long does the

13 government want to respond?

14          MR. McDONALD:  A month, Your Honor.

15          THE COURT:  That's fine.  So there will be no trial

16 coming up.  The rest of the motions, I'm just going to

17 terminate as moot.  I gave my ruling orally here, because we

18 are on the eve of trial.  This is normally something that I

19 would write on, but I don't have time to write, given that we

20 are right up on it.  So I'm simply going to enter an order

21 that says, for the reasons stated on the record, the motion

22 to dismiss is granted, and that the indictment is dismissed,

23 and that there will be further determination about whether

24 the dismissal is with or without prejudice.

25          Anything else?

1           MR. McDONALD:  Not from the government, Your Honor.

2           THE COURT:  Mr. Nemeth?

3           MR. THOMPSON:  Yes, Your Honor.  We have one other

4   item to take up with the Court.

5           THE COURT:  Okay.

6           MR. THOMPSON:  May I approach?

7           THE COURT:  Yep.

8           MR. THOMPSON:  Your Honor, we need to lay down a

9   marker on this particular issue I'm going to bring up,

10  because we have seen the government take corrective action

11  after it knows there's a serious flaw in its indictment.

12          Your Honor, we have this other case hanging out

13  there, it's the 2022 case.  If you look at the indictment

14  specific to the tax charges, it raises the same allegation

15  that Cory Mann was a sole proprietor.  We can only conclude

16  that the government got there by producing the same

17  witnesses, the same type of testimony.

18          I wanted to make an oral motion, now, for

19  disclosure of those materials pursuant to criminal

20  rule -- Federal Rule of Criminal Procedure 6(e)(3)(E)(ii),

21  for the production of those Grand Jury materials.

22          I also want to set down this marker because we

23  could anticipate that the government will try to supersede

24  that indictment in the 2022 case, based on the Court's ruling

25  today.

```
 1          THE COURT:  Is there any reason you can't file this
 2   motion in writing?
 3          MR. THOMPSON:  We can file the motion, Your Honor,
 4   in writing, if that is what the Court prefers, but I wanted
 5   to put that on the record today, that we will be seeking
 6   that, in light of the shown pattern of corrective action.
 7          THE COURT:  Well, what's to stop the government
 8   from getting a superseding indictment in the other case if
 9   they do it some different way?
10          MR. THOMPSON:  Your Honor, I just wanted to put it
11   on the record.  We will certainly file our briefings per the
12   Court's directive.
13          THE COURT:  Okay.  You can file whatever you want.
14   If you file a motion, I will decide it.  To the extent that
15   you're making an oral motion, I'm going to deny it without
16   prejudice, because as I sit here right now -- first of all,
17   I'm tired.  We have been going for three hours.  And second
18   of all, you've quoted a rule with a lot of subparts.  I have
19   no idea what you're talking about, as you stand there.  If
20   you file a motion and a brief, I'll read it carefully.
21          MR. THOMPSON:  Understood, Your Honor.  Thank you.
22          THE COURT:  Ms. Kriger, anything else from you?
23          MS. KRIGER:  No.  Thank you, Your Honor.
24          THE COURT:  All right.  Thank you.  We are
25   adjourned.
```

*Motion Hearing • May 15, 2024*

**113**

1          THE CASE MANAGER:  All rise.  Court is in recess.

2       (Proceedings concluded at 12:24 p.m.)

3                    _   _   _

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *C E R T I F I C A T I O N*

2          I, Robert L. Smith, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United

5    States Code, Section 753, do hereby certify that the

6    foregoing pages comprise a full, true and correct transcript

7    taken in the matter of UNITED STATES OF AMERICA vs. CORY

8    JUSTIN MANN and RACHEL LOCRICCHIO, Case No. 20-20599, on

9    Wednesday, May 15, 2024.

10

11

12                              *s/Robert L. Smith*
                                Robert L. Smith, RPR, CSR 5098
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15
     Date:  05/17/2024
16   Detroit, Michigan

17

18

19

20

21

22

23

24

25