UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

      Plaintiff,                       Case No. 20-cr-20599

      v.                             Hon. Matthew F. Leitman

JOHN ANGELO, ET AL.,

      Defendants.

_____

**GOVERNMENT'S ANSWERS TO THE COURT'S QUESTIONS
RELATING TO RULE 29 MATTERS**

_____

The United States of America ("the government") hereby files this memorandum in response to a series of questions the Court posed to counsel at a hearing held on February 26, 2024, in relation to defense counsels' Motion for Judgment of Acquittal. ECF Nos. 412, 413, 465.

Rule 29(c) of the Federal Rules of Criminal Procedure governs this motion for a judgment of acquittal following a jury verdict or discharge, providing, "If the jury has failed to return a verdict, the Court may enter a judgment of acquittal" but when reviewing a criminal defendant's motion for a judgment of acquittal, the Court "must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt.'" *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *accord, e.g., United States v. Sawyers*, 409 F.3d 732, 735 (6th Cir. 2005); *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999). This standard applies equally to circumstantial and direct evidence. *Humphrey*, 279 F.3d at 378.

The government asks this Court to recognize that "[c]ircumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *Id.* (quoting *United States v. Talley*, 194 F.3d 758, 765 (6th Cir. 1999) (companion case to *Talley*, 164 F.3d 989))

The following are the Court's questions and the government's responses to those questions.

## **QUESTIONS FOR COUNSEL**

In organizing the questions for counsel, the Judge stated that he believes that whether the tax returns are false rests on three fundamental assertions:  1) Mr. Angelo should have reported on the tax returns monies that were paid to NJC, or some portion of them; 2) Mr. Angelo should have reported on his tax returns money that was paid to Robin Street, or some portion of them; and 3) Mr. Angelo should have reported on his tax returns the cash that was put into his hand, at least by Mr. Beydoun. (ECF No. 559, PageIDs 12243 and 12244, Lines 24 to 7)

The Court is accurate in that the government's case was to show that Defendant John Angelo, from 2010 to 2013, provided services to Who Can I Sue and requested to be paid as NJC Marketing. Therefore, any checks from Who Can I Sue to NJC Marketing is income to Defendant John Angelo. Similarly, Defendant John Angelo, from 2014 to 2017, provided services to multiple clients and received payment as Robin Street Consultants. Anthony Sereno testified that Defendant John Angelo and he split all Robin Street Consultants income. Therefore, half of the money paid to Robin Street Consultants is income to Defendant John Angelo. The government further showed that Defendant John Angelo and Anthony Sereno provided services to Nabil Beydoun and received cash payments for those services. Sereno testified that Defendant John Angelo and he split the cash.

The government's, through Revenue Agent Kelly Williams, added up all payments to NJC Marketing and Robin Street Consultants, including cash payments made by Beydoun. Revenue Agent Williams determined which years the payments had been made and assigned that tax year a total income amount. The government then compared the total income amount earned that year by Defendant John Angelo and compared those amounts to the income amounts reported on Defendant John Angelo's personal tax returns. The evidence shows that Defendant John Angelo reported less income on his personal tax returns than he earned.

To expand upon these issues, the Court offered counsel the following questions to answer:[1]

1) Regarding payments to NJC Marketing, the Court asked the government for its response to the defense's argument that the NBKC Bank documents are from a different period and do not directly address the fact that there were operations in Michigan. (ECF No. 559, PageID 12244)

2) Regarding Joe DeSanto's testimony, the Court asked for clarification on the government's view on whether 404(b) evidence shows that what was happening regarding DeSanto's payments to NJC Marketing was happening in 2015, 2016, and 2017. (ECF No. 559, PageID 12244 to 12245)

3) Assuming Robin Street Consultants (RSC) was formed with the express intent to hide income, what is the basis for a finding that money paid to RSC should have been reflected on Mr. Angelo's tax returns. (ECF No. 559, PageID 12245)

   a. How can the government establish that basis without expert testimony or an explanation as to what the legal rules were? (ECF No. 559, PageID 12245)

---

[1] The Court's questions begin on page 80 (PageID.12243) of the transcript provided to counsel. The Transcript is found at ECF No. 559.

4) Does the government wish to persist in the theory that the failure to report cash paid to RSC by the Beydoun's is something that makes the returns false. (ECF No. 559, PageID 12245)

    a. How is the failure to report cash fairly encompassed within the charge? (ECF No. 559, PageID 12245)

    b. Did the government submit proof, that would include W-2s and 1099s, that would reflect officially reported gross income and then match that up to Mr. Angelo's tax returns? (ECF No. 559, PageID 12245 to 12246)

        i. How is the cash a part of the case?

        ii. Show the Court how the cash was not reported ("do the math for me." (ECF No. 559, PageID 12246))

        iii. Show the Court how John Angelo's officially reported income ties exactly to the amounts that Mr. Angelo listed on his tax returns.

        iv. If Mr. Angelo received the cash and it didn't end up on his tax return, then where did it end up? (ECF No. 559, PageID 12246)

        v. If the unreported cash is the only basis to find the returns to be false, is there any evidence that Rosina Angelo was aware of any cash payments and whether

that could be a basis for holding her liable.

## ARGUMENT

The government's response to the Court's questions is below.

### I.    *Response to defense argument that the NBKC Bank documents are from a different period and do not directly address the fact that there were operations in Michigan.*

On July 10, 2014, a person purporting to be Anthony Sereno faxed employment verification documents to National Bank of Kansas City (NBKC). (Gov. Ex. 3001-5) Within those documents is a statement signed July 7, 2014, from "Rosina Caruvana." The signed statement includes the following declaration: "NJC Marketing is owed *[sic]* by myself and the company is based out of NJ. I buy Media for the NJ market only." (Gov. Ex. 3001-5, page 9)

At trial, the government introduced the following witnesses:  attorney Justin Grove, attorney Mark Dundon, and Christopher Hite, an assistant to attorney Thomas Quartz. Grove, Dundon, and Quartz had provided payments to NJC Marketing for services provided by John Angelo in 2016. (ECF No. 406, PageID 7761, Lines 16 to 21) and (ECF No. 406, PageID 7760, Lines 23 to 25; ECF No. 406, PageID 7791, Lines 15 to 19). The government also introduced David Katz who testified that his company, Health Systems Medical Management (HSMM), also made payments to NJC Marketing in 2015, per Cory Mann's instructions. (ECF No. 406, PageID

7685, Lines 6 and 7, and Gov. Ex. 201). The government's position is that Defendant John Angelo provided services to Grove, Dundon, Quartz, and Cory Mann and requested his clients make payments to NJC Marketing to avoid paying over taxes to the IRS for income he earned.

The government noted that Defendant Angelo had pursued a similar scheme during his time with the company Who Can I Sue (WCIS) several years earlier. Defendant John Angelo requested that Joe DeSanto, an owner of WCIS, make all future wage payments owed to Angelo to "NJ Marketing." DeSanto complied and drafted a series of checks to NJ Marketing beginning on September 10, 2010 (Gov. Ex. 4010). DeSanto testified that Defendant John Angelo asked to draft the checks to NJ Marketing "because he (John Angelo) had a tax issue that he hadn't cleared up yet, hadn't dealt with." (ECF No. 403, PageID 7613, Lines 8 and 9). The evidence showed WCIS paid Defendant John Angelo as NJ Marketing from September of 2010 up to December of 2013. (Gov. Ex.. 4010).

In light of the government's evidence, defense counsel raised two points:  the NBKC employee verification documents are from an earlier period ("That mortgage application was in 2014, so it's very possible that the truth changes over time." ECF No. 559, PageID 12179, Lines 13 to 15), and the mortgage documents do not address the fact that there were operations in Michigan.

Mr. Hurford has argued that the statements made by Rosina Caruvana on the form submitted to NBKC were relevant on July 7, 2014, but by 2016 NJC Marketing was conducting business in Michigan. Mr. Hurford cites to an email exchange between Defendant Rosina Angelo and Tracy Varjabedian where Ms. Varjabedian asks Defendant Rosina Angelo to whom she should make a payment for advertising to. Defendant Rosina Angelo states that Ms. Varjabedian should make the payment to NJC Marketing. (ECF No. 406 PageIDs 7840 and 7841, Lines 23 to 3)  Mr. Hurford cites this as proof that NJC Marketing, by 2016, had expanded its operations into Michigan.

First, the government's argument is that NJC Marketing, or NJ Marketing, is a sham entity created solely to hide Defendant John Angelo's income from the Internal Revenue Service. To avoid making payments towards his outstanding tax balance he requested that WCIS make checks payable to a third-party company which had no affiliations with WCIS. DeSanto testified that Defendant John Angelo requested the payments be made to NJC Marketing "because of his tax issues." (ECF No. 403, PageID 7634, Lines 21 and 22).

To support its contention, the government notes that the first check drafted by WCIS to NJ Marketing occurred on September 10, 2010, five days prior to NJC Marketing filing its Certificate of Formation with the State Treasurer of New Jersey on September 15, 2010. (See Defense Exhibit W).

Based on this evidence, a jury could reasonably reach the following conclusions:  1) Defendant John Angelo's request to have WCIS draft his wages to a company that had yet to be formed in light of his outstanding tax balance is evidence that the company was formed for purposes of tax avoidance and fraud, 2) since the original payment from WCIS to NJ Marketing occurred prior to the company's formation that any payments after September 15, 2010, are also attempts by Defendant John Angelo to hide his personal income and avoid paying taxes, and 3) payments made to NJC Marketing for services provided by Defendant John Angelo after the IRS discharged his outstanding debt in 2015 are also for the purposes of hiding income and tax avoidance. A jury could also reasonably conclude that Defendant John Angelo's plan to avoid paying taxes extended beyond his time working for WCIS and continued during the time he received payments as Robin Street Consultants and NJC Marketing in Michigan.

In regard to Mr. Hurford's argument that the NBKC document is from a different period of time, the government notes that Defendant Rosina Angelo sent the document to the bank on July 7, 2014. Gov. Ex. 201, page 2, shows HSMM check no. 2182 for $5,000 was made payable to NJC Marketing and was dated June 3, 2015.  While July 7, 2014, is certainly prior to payments made to NJC Marketing by HMSS and Grove, Dundon, Quartz, and Katz in 2015, 2016, and 2017, when viewed in the light most favorable to the

government, a rational trier of fact could have found the business model proclaimed by Defendant Rosina Angelo on July 7, 2014, was still in effect on June 3, 2015, less than 11 months after her declaration. While business models are subject to change, a business model can certainly be effective for 11 months. Stating that Defendant Rosina Angelo's declaration was made in 2014 is "a different period of time" than 2015, 2016, or 2017 does not make it such. The evidence does not support the Defendant's argument.

Less than a year prior to Defendant Rosina Angelo submitting the employment forms to NBKC, WCIS compensated Defendant John Angelo for services provided in Florida and Michigan with checks made payable to NJ Marketing per Defendant John Angelo's instructions. *See* Gov. Ex. 4010, page 3. On December 13, 2013, seven months prior to Defendant Rosina Angelo's statement to NBKC, WCIS paid NJ Marketing $41,000 as a settlement payment for the services Defendant John Angelo provided in Florida and Michigan. When viewed in the light most favorable to the government, a rational trier of fact could reasonably conclude that if NJ Marketing performed services in Florida and Michigan seven months prior to Defendant Rosina Angelo's statement to NBKC, then payments made to NJC Marketing after Defendant Rosina Angelo's declaration are also fraudulent. A jury could also reasonably believe that since Defendant John Angelo used NJC Marketing for tax avoidance from 2010 to 2013 and Defendant Rosina

Angelo's statement to NBKC is fraudulent in light of the 2010 to 2013 payments, that same jury could reasonably find that payments to NJC Marketing in 2015 (Gov. Ex. 201), 2016, and 2017 (Gov. Ex. 30010) were also made for tax avoidance purposes.

The evidence shows Defendant John Angelo received payments as NJ Marketing or NJC Marketing from 2010 to 2013 and then again in 2015, 2016 and 2017. Defendant Rosina Angelo's statement to NBKC Bank fell directly in the middle of those payments to NJC Marketing. In fact, WCIS paid Defendant John Angelo as NJ Marketing seven months prior to the statement (Gov. Ex. 4010, page 3) and HMSS paid Defendant John Angelo as NJC Marketing less than 11 months after the declaration. (Gov. Ex. 201, page 2). Suggesting that the documents provided to NBKC represent a different period of time is a faulty argument. Not only is it not a different period of time, but Defendant Rosina Angelo's declaration to NBKC falls directly in the middle of a years-long period where Defendant John Angelo is providing services outside of New Jersey being paid as NJC Marketing, or NJ Marketing.

At the time Defendant Rosina Angelo had the documents forwarded to NBKC, Defendant John Angelo and Anthony Sereno had already been conducting business in Michigan under the name Robin Street Consultants. Defendant Rosina Angelo's declaration to NBKC further notes that "Robin

Street Consultants is based out of Michigan. I market and manage the media for the Company." Gov. Ex. 3001-5, page 9. Defendant Rosina Angelo's statements show that Robin Street Consultants, a company she is declaring that she works for, is already conducting media business in Michigan. Simultaneously, she declares that NJC Marketing buys media for the New Jersey market only. A jury could find it counterintuitive to suggest that Robin Street Consultants, a company owned by Anthony Sereno and John Angelo and employing Rosina Angelo, provides media services in Michigan while NJC Marketing also provides the same services in the same state when Defendant Rosina Angelo has already stated that the latter works exclusively in New Jersey. To believe the defendants arguments the jury would have to believe that Robin Street Consultants and NJC Marketing, two companies that are populated by the same people, are competing against each other by providing the same services to the same demographic. Further, it is counterintuitive that Defendant John Angelo, who co-owns Robins Street Consultants, would provide services to another company, NJC Marketing, thereby competing with Robin Street Consultants, his own company.

DeSanto's statements show that Defendant Rosina Angelo's declaration was not, in fact, from a different period of time. Rather, her declaration to NBKC occurred directly in the middle of Defendant John Angelo's use of NJC Marketing as a nominee to disguise his income.

DeSanto testified that Defendant John Angelo approached him in late 2010 requesting his paychecks for services provided in Michigan and Florida be made to NJ Marketing. Similarly, the testimonies of Katz, Grove, Dundon, and Christopher Hite show that Defendant John Angelo asked them to draft checks to him for services provided in Michigan in 2015 and 2016. Defendant John Angelo's request to the Michigan attorneys is clearly not indicative of NJC Marketing suddenly expanding into the Michigan market, but a continuation of Defendant John Angelo's scheme to hide his income from the IRS.

The defense's argument that payments to NJC Marketing in 2015, 2016, and 2017 is evidence that the business model had changed and that NJC Marketing was not doing business in Michigan is faulty. As detailed above, Defendant Rosina Angelo's declaration occurred in July of 2014. If the only payments to NJC Marketing had occurred after the declaration, then the defense may have a point. However, Defendant Rosina Angelo's declaration came after Defendant John Angelo had been paid as NJ Marketing for the three previous years for services provided in both Florida and New Jersey. The defense's argument conveniently ignores this critical point. To believe the defense's argument then a juror would have to believe that NJC Marketing provided services in Florida and Michigan from 2010 to 2013, changed the business model in 2014 to solely provide services in New

Jersey, and then changed the business model a second time shortly thereafter to include Michigan. These facts are highly unlikely.

When considering all of the evidence (payments to NJ Marketing before the company even formed, Defendant John Angelo telling DeSanto he wanted to be paid as NJ Marketing to avoid taxes, Defendant John Angelo continuing to use NJC Marketing in Michigan in 2015, 2016, and 2017 to avoid taxes) in the light most favorable to the government, a rational trier of fact could find that Defendants John Angelo and Rosina Angelo used NJC Marketing to hide Defendant John Angelo's income.

> ## II.   *Regarding Joe DeSanto's testimony, the Court asked for clarification on the government's view on whether 404(b) evidence shows that what was happening in regard to DeSanto's payments to NJC Marketing was happening in 2015, 2016, and 2017.*

The government's position is that Defendant John Angelo instructed DeSanto to make payments to NJ Marketing in 2010 for tax avoidance purposes. The government further contends that payments to NJC Marketing and Robin Street Consultants in 2015, 2016, and 2017 are also for tax avoidance purposes. Joe DeSanto testified that Defendant John Angelo asked DeSanto to make checks from WCIS to Defendant Angelo for services provided payable to NJ Marketing. The evidence shows that the first check drafted by WCIS to NJ Marketing was dated September 10, 2010. (Gov. Ex. 4010). The defense introduced Def Ex W, a document showing NJC

Marketing formed on September 15 of 2010. So, the same month that

Defendant John Angelo asked DeSanto to draft his paychecks to NJ

Marketing is the same month that the company had been established. In fact,

NJ Marketing filed its certificate of formation five days after WCIS drafted its

first check to NJ Marketing.

The evidence shows that WCIS continued to pay Defendant John

Angelo as NJ Marketing from late 2010 through 2013. (Gov. Ex. 4010) In

2014, Defendant Rosina Angelo submits her paperwork to NBKC with the

declaration that NJC Marketing only provides services in the New Jersey

market despite the fact Defendant John Angelo had been paid as NJ

Marketing from 2010 through 2013 for providing services exclusively in

Michigan and Florida. (ECF No. 403, PageID 7613, Line 22).

So, the government has established that Defendant Rosina Angelo's

statement to NBKC is fraudulent. The government's contention is that the

statement is fraudulent because NJC Marketing did not provide any services,

but merely existed as a means for Defendant John Angelo to hide his

income. The government cites the fact that Defendant Rosina Angelo

established NJC Marketing the same month as Defendant John Angelo

requested that DeSanto pay him as NJC Marketing. Combine these facts

with DeSanto's statement that Defendant John Angelo requested to be paid

as NJC Marketing "because he had a tax issue" (ECF No. 403, Page ID

7613, Line 8), and the evidence strongly suggests that NJC Marketing had been established solely to disguise Defendant John Angelo's income.

The evidence shows that Defendant John Angelo's criminal conduct towards his taxes continued in relatively the same manner from 2015 to 2017. The evidence shows that in 2015 through 2017, Defendant John Angelo, just like from 2010 to 2013, continued to be paid through nominee companies (NJC Marketing and Robin Street Consultants), had people close to him place their names on the nominee companies as owners (Rosina Angelo with NJC Marketing and Anthony Sereno with Robin Street Consultants), had his customers draft checks to the nominee companies (WCIS paid NJ Marketing from 2010 to 2013 and business partners paid NJC Marketing or Robin Street Consultants from 2015 to 2017), and Defendant John Angelo failed to report all income he earned during those years on his personal tax returns.

The difference between the 2010 to 2013 payments from WCIS to NJ Marketing and the 2015 to 2017 payments from business associates to NJC Marketing and Robin Street Consultants would be Defenant John Angelo's motive. During the 2010 to 2013 time period, Defenant John Angelo had a significant outstanding tax due and owing with the IRS. In 2015, the IRS discharged the outstanding debt. However, even after the IRS discharged the outstanding tax due and owing Defenant John Angelo continued to be paid

through nominee companies, those nominee companies were in the names of other individuals, and he continued to underreport his personal income. His motive from 2015 to 2017 is simply tax avoidance, meaning he did not want to report all of his income and pay over his full tax due and owing. Instead, he reported a portion of his income.

For example, for the 2015 and 2016 tax years, Robin Street Consultants earned a more than $1.3 million in income. Per Sereno's testimony, half of that money is Defenant John Angelo's. The evidence shows Defendant John Angelo reported the following amounts of personal income: $42,500 for the 2015 tax year and $54,800 for the 2016 tax year. Clearly, he significantly underreported his income to avoid paying over the significant amount of taxes he would have owed. Just like from 2010 to 2013, Defendant John Angelo accomplished this through the use of nominee entities, close associates maintaining ownership of the nominee entities, and directing business associates to make payments to the nominee entities.

**III.    Assuming Robin Street Consultants (RSC) was formed with the express intent to hide income, what is the legal basis for a finding that money paid to RSC should have been reflected on Mr. Angelo's tax returns.**

**a.  How can the government establish that basis without expert testimony or an explanation as to what the legal**

## *rules were? (ECF No. 559, PageID 12245)*

Money paid to Robin Street Consultants should have been reflected on Mr. Angelo's tax returns for several reasons. First, the evidence clearly shows that Defendant John Angelo held a 50% interest in Robin Street Consultants. Defendant John Angelo and Anthony Sereno formed Robin Street Consultants and served as co-owners of the company. (ECF No. 411, PageID 8037, Lines 16 to 24). At trial, Anthony Sereno testified that Defendant John Angelo and he served as 50/50 partners in Robin Street Consultants and shared in the profits equally with Defendant John Angelo's sister, Defendant Rosina Angelo serving as the business bookkeeper and receiving the business bank statements. (ECF No. 411 Page ID 8038, Line 2 to 9; PageID 8041, Lines 7 to 12; PageID 8044, Lines 16 and 24). Anthony Sereno also testified that he did not draft checks from the Robin Street Consultants account, but Rosina Angelo did (ECF No. 411 PageID 8045 Lines 4 to 12). Witness Reann Sereno corroborated Anthony Sereno's testimony, in part, testifying that she resided on Lafayette Street in Summit, New Jersey and when mail arrived for Robin Street Consultants, Reann Sereno would scan the Robin Street Consultants mail to Anthony Sereno or to Rosina Angelo. (ECF No. 410 Page ID 7918, Line 12 to PageID 7919, Line 23).

Witness Tracy Varjabedian corroborated Sereno's testimony when she

testified that Anthony Sereno and John Angelo owned Robin Street Consultants. (ECF No. 406, PageID 7813, Lines 15 and 16). She further corroborated Sereno's testimony when she testified that when she worked with Robin Street Consultants, she dealt with both Sereno and John Angelo. (ECF No. 406, PageID 7818, Lines 10 to 12). Ms. Varjabedian also testified that Sereno and Defendant John Angelo lived together from 2014 to 2017 at a home she owned in Birmingham, MI. (ECF No. 406, PageID 7812, Lines 2 to 11). Sereno further testified that the reason he is the only person listed on the business's formation documents and bank account is because Defendant John Angelo had tax issues. (ECF No. 411, PageID 8041, Lines 13 to 17) and Cory Mann did not want to be associated with Defendant John Angelo (ECF No. 414, PageID 8146, Lines 10 to 12).

The government introduced checks made payable to Robin Street Consultants from numerous businesses for services provided from 2015 to 2017. (ECF No. 414, PageID 8124 to 8132). The government also introduced evidence showing that Defendant John Angelo endorsed and deposited many of the checks drafted to Robin Street Consultants into the business's bank account. (Gov. Ex. 4012B, page 4; ECF No. 411, PageID 8050, Lines 24 and 25, and Page ID 8051, Lines 1 to 4). The government also introduced testimony from Defendant Sereno where he explained that Defendant John Angelo and he provided services to Frank and Nabil

Beydoun in return for cash payments. (ECF No. 414, PageID 8132, Lines 9 to 24)  Sereno testified that Defendant John Angelo and he split the cash. The government further introduced evidence of a $200,000 payment from Gravity Imaging to Defendant John Angelo and Sereno for the termination of an business relationship between Gravity Imaging and Robin Street Consultants. (ECF No. 414, PageID 8133 to 8134). Sereno testified that Defendant John Angelo and he split the check. (ECF No. 414, PageID 8134, Lines 16 to 18). So, the government introduced evidence through witness testimony showing that Defendant John Angelo held a 50% interest in Robin Street Consultants, Defendant Rosina Angelo wrote company checks and served as the company bookkeeper, Defendants John Angelo and Anthony Sereno split the company's profits, and that Robin Street Consultants earned significant income during the relevant years.

The government next showed that Defendant John Angelo earned half of the income and his sister, Defendant Rosina Angelo, possessed the Robin Street Consultants checkbook, through the testimony of Anthony Sereno. Again, Sereno testified that Defendant John Angelo and he agreed to split all Robin Street Consultants gross receipts 50/50. (ECF No. 411, PageID 8041, Lines 7 to 12; ECF No. 411, PageID 8045, Lines 2 to 12).  Sereno's testimony is corroborated by Nabil Beydoun when Mr. Beydoun testified that he maintained a business relationship with Defendant John Angelo and

Anthony Sereno in 2016 and 2017 and paid cash to both gentlemen at different times. (ECF No. 417, PageID 8505, Lines 3 to 16).

The legal basis that Defendant John Angelo's share of the income should have been reported on his personal tax returns begins with 26 U.S.C. § 61 which states "gross income means all income from whatever source derived, including compensation for services and gross income derived from business. 26 U.S.C. § 61(a)(1) and (a)(2). Sereno testified that Robin Street Consultants provided services to multiple clients and the clients paid compensation for those services. (ECF No. 411, PageID 8047, Lines 16 to 21). Sereno further testified that Defendant John Angelo and he split the profits 50/50. (ECF No. 411, PageID 8038, Lines 7 to 9). In accordance with § 61 of the Internal Revenue Code, Defendant John Angelo earned income during 2015, 2016, and 2017. Nabil Beydoun testified that he hired Robin Street Consultants in 2016 and 2017 and paid Defendant John Angelo and Sereno cash on a weekly basis for services provided. (ECF No. 417, PageID 8503 and 8504).

Internal Revenue Code § 1 states that a tax is imposed on specific individuals (married individuals, single individuals, etc.) in accordance with the amount of income earned by the individual in a specific year. Internal Revenue Code § 1(c) states that "There is hereby imposed on the taxable income of every individual who is not a married individual a tax" determined

21

in accordance with the corresponding income/tax table. Sereno testified that Defendant John Angelo and he entered a business relationship to form Robin Street Consultants. Sereno further testified that the two of them agreed to split the income earned 50/50. Sereno then subsequently verified checks as payments to Robin Street Consultants for the years 2015, 2016, and 2017 for services provided. Per Sereno's testimony, half of the income earned via those checks was earmarked as income to Defendant John Angelo. Per the Internal Revenue Code, Defendant John Angelo was required to report the income on his respective tax returns. Defendant Rosina Angelo possessed the Robin Street Consultants checkbook, and thus she, and Defendant John Angelo, through his sister, controlled all Robin Street Consultants funds and could write checks and disburse Robin Street Consultants funds as they saw fit. (ECF No. 411, PageID 8045, Lines 2 to 12).

The government contends that a juror would not need expert testimony to understand that a person earning income is required to pay taxes on the income. Federal Rule of Evidence 702 states that "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the Court that it is more likely than not that:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." The concept of earning income and paying taxes is a common understanding among American working individuals as each is required to report and pay over taxes on income earned from any source derived. An expert opinion is not necessary to explain this concept to a jury. Most American adults earn income and pay taxes on that income. The government contends that this is basic knowledge for adult Americans.

If Defendant John Angelo had deductions, credits, or carryover losses from another year an expert would most likely be needed to determine a particular tax due and owing, but the basic concept of whether a person who earns income is required to pay taxes on that income is common knowledge among adults in the United States. The Court's question as to whether an expert was necessary to establish that Defendant John Angelo earned income during the relevant years and owed income on that money is answered with a resounding "no."

The testimonies of Sereno, Beydoun, and Varjabedian all established that Defendant John Angelo and Sereno earned income during 2015, 2016, and 2017. Sereno established that all income earned by Robin Street Consultants was split 50/50. Common knowledge would inform the jury that

taxes should be paid on that income. Therefore, expert testimony was not required.

IV.   ***Does the government wish to persist in the theory that the failure to report cash paid to Robin Street Consultants by the Beydoun's is something that makes the returns false.***

   a.  ***How is the failure to report cash fairly encompassed within the charge?***

The government's theory is that Defendant John Angelo earned income in 2015, 2016, and 2017 in amounts far greater than what he reported on his personal tax returns which made his returns false. The cash paid by the Beydouns to Defendant John Angelo and Anthony Sereno is income earned by Defendant John Angelo and Sereno during the respective years in addition to the checks drafted to Robin Street Consultants. The government's intent is to show the total income earned by Defendant John Angelo during the respective years through checks drafted to Robin Street Consultants, checks drafted to NJC Marketing, and cash paid by the Beydouns and compare that total income amount to the amounts of income Defendant John Angelo reported on his 2015, 2016, and 2017 personal income tax returns.

Sereno testified that the Beydouns paid cash for services provided by Defendant John Angelo and him and that the two of them split the cash. The

splitting of the cash is commensurate with Sereno's testimony that Defendant John Angelo and he split all Robin Street Consultants income 50/50. Regardless of the source of the income, the two split all funds paid to Robin Street Consultants.

The government's intent in introducing the cash payments was to add those amounts to the total amounts of income earned by Defendant John Angelo and Sereno during the relevant years from all sources derived. The government would then divide the total amount of income earned during each respective year and assign half of that value to Defendant John Angelo. So, the fact that they the payment was in cash is not relevant. What is relevant is that the Beydouns paid some amount to Defendant John Angelo and Sereno and those amounts were added to the total amount earned that year. The total amount was then divided in half and each half was assigned as income to Defendant John Angelo and Sereno. The government then compared Defendant John Angelo's half to what was reported on his personal tax returns. So, the cash is relevant only in that it is additional income to be added to the total income earned during the respective years it was paid.

The government captured this methodology in the Indictment when it stated in the charging language that Defendant John Angelo electronically signed the return indicating the return was true and accurate and "listed all

amounts and sources of income received during the year, whereas Defendants John Angelo and Rosina Angelo, then and there well knew and believed, Defendant John Angelo had earned additional business gross receipts, adjusted gross income, and taxable income through Robin Street and NJC Marketing." (For example, ECF No. 340, Indictment Paragraph 92).

The evidence shows that Defendant John Angelo's share of the checks drafted to Robin Street Consultants by third parties is greater than the total income amounts reported on his 2015, 2016, and 2017 personal returns and the 2015, 2016, and 2017 J&A Consultants returns. Even if the cash payments had not been included, Defendant John Angelo still reported less than what he earned in each of the respective tax years based solely his share of the checks paid to Robin Street Consultants. The government included the cash payments from the Beydouns because the payments constituted additional income earned by Defendant John Angelo and Sereno during the respective years.

## V.    Did the government submit proof  that would include W-2s and 1099s that would reflect officially reported gross income and then match that up to Mr. Angelo's tax returns?

The government did submit Forms W-2s issued to Defendant John Angelo that reflected officially report gross income. (Gov. Ex.s 49729, 49730, 49731, and 43510). The government submitted John Angelo's 2015

Form 1040, 2016 Form 1040EZ, and 2017 Form 1040EZ.

The 2015 Form 1040 reported $42,500 in wages. Defendant John Angelo reported no other income. Attached to the Form 1040 was a W-2 issued to John Angelo from J&A Consultants in the amount of $42,500.

The 2016 Form 1040EZ reported $54,800 in wages. Defendant John Angelo reported no other wages. The government also submitted Gov. Ex. 43510, an IRS document showing that for the 2016 tax year J&A Consultants issued Defendant John Angelo a Form W-2 reporting $54,800 in wages.

The 2017 Form 1040EZ reported $77,100 in wages. Defendant John Angelo reported no other wages. Attached to the Form 1040EZ was a W-2 issued to Defendant John Angelo by J&A Consultants in the amount of $77,100.

Clearly, the total income reported on Defendant John Angelo's 2015, 2016, and 2017 personal tax returns derived solely from Forms W-2 issued by J&A Consultants, which means Defendant John Angelo reported no other income on those tax returns.

### i. How is the cash a part of the case?

The cash is relevant to this matter. Nabil Beydoun testified that in 2016 in 2016 and 2017, he paid Defendant John Angelo and Sereno "right around $1200 a week." (ECF No. 417, PageID 8504, Line 5). Sereno testified that

Defendant John Angelo and he split the cash. (ECF No. 414, PageID 8132, Lines 23 and 24). As noted above, for the 2015, 2016, and 2017 tax years the only income Defendant John Angelo reported on his tax returns consisted of money paid to him from J&A Consultants and memorialized on corresponding Forms W-2. That would mean that any additional income paid to him from other sources, including the cash paid to Sereno and him by Beydoun, had not been reported on his 2015, 2016, and 2017 personal tax returns.

### ii. Show the Court how the cash was not reported ("do the math for me."

To reiterate what the government stated above, for the 2015, 2016, and 2017 tax years, J&A Consultants issued Defendant John Angelo Forms W-2 showing $42,500, $54,800, and $77,100 in income earned. A review of Defendant John Angelo's tax returns shows he reported only those amounts of income as his total income earned for those respective years. As such, any income earned by Defendant John Angelo above and beyond those amounts is income he failed to report on his tax returns.

The cash specifically is not relevant. What is relevant is that the cash represents additional income earned by Defendant John Angelo in 2016 and 2017. When added to the other income Robin Street Consultants earned in 2016 and 2017, the government shows the total amount of income earned by

Defendant John Angelo during those years. Matching the total income amounts to the reported amounts on the respective tax returns shows Defendant John Angelo underreported his income. The cash is relevant only in that it is additional income earned.

### iii. Show the Court how John Angelo's officially reported income ties exactly to the amounts that Mr. Angelo listed on his tax returns.

This question has been answered in the paragraph "V."

### iv. If Mr. Angelo received the cash and it didn't end up on his tax return, then where did it end up?

Sereno testified that Beydoun paid Defendant John Angelo and him weekly in cash. Sereno further testified that Defendant John Angelo and he split the cash. Sereno did not elaborate as to what they each did with the cash. The nature the cash is such that it is difficult to trace once it is in the physical custody of Defendant John Angelo. However, the evidence indicates the cash was in the physical custody of Defendant John Angelo and he received it as payment for services.

The Court's question is difficult to answer. The government's intent at trial was to show the jury that Defendant John Angelo made a certain amount of income during the relevant years through checks drafted to Robin Street Consultants, checks drafted to NJC Marketing, and cash payments.

The government then added up the total amounts of gross receipts earned, divide it in half, and assign one half of the gross receipts to Sereno and the other half to Defendant John Angelo. Where each individual source of income, including the cash, ended up is difficult to determine. The government did show that the checks drafted to Robin Street Consultants did end up in the business bank account. However, it is nearly impossible to show where the cash went. What the government did show at trial is that Defendant John Angelo earned a particular amount of income through Robin Street Consultants and NJC Marketing (to include the cash payments) and reported significantly less on his tax returns, thereby making the returns false.

> *v.* ***If the unreported cash is the only basis to find the returns to be false, is there any evidence that Rosina Angelo was aware of any cash payments and whether that could be a basis for holding her liable.***

The cash is not the only basis to find Defendant John Angelo's tax returns false. Sereno testified that Defendant John Angelo and he owned Robin Street Consultants 50/50 and split the profits evenly. (ECF No. 411, PageID 8038, Lines 7 through 9). The government introduced a number of checks paid to Robin Street Consultants from various business in 2015,

2016, and 2017. (Gov. Ex. 4012B). The exhibit contained hundreds of checks paid to Robin Street Consultants for services provided by Sereno and Defendant John Angelo. As mentioned above, Defendant Rosina Angelo possessed the Robin Street Consultants checkbook and thus she, and her brother Defendant John Angelo, controlled all Robin Street Consultants funds that were deposited into the relevant bank account. (ECF No. 411, PageID 8045, Lines 2 to 12).

For the 2015 tax year, Robin Street Consultants received checks from business for services provided by Defendant John Angelo and Sereno. The checks totaled $535,850. According to Sereno's testimony, Defendant John Angelo received half of these funds, or $267,925.

J&A Consultants reported $57,110 in gross receipts for the 2015 tax year. Defendant John Angelo reported $42,500 in total income on his 2015 Form 1040. A reasonable jury could find Sereno's testimony credible and determine that Defendant John Angelo did co-own Robin Street Consultants 50/50 and split the income. Therefore, a reasonable jury could determine that Defendant John Angelo did earn $267,925 from Robin Street Consultants in 2015 and reported only $57,110 on the J&A Consultants return and $42,500 on his personal return thereby making the 2015 Form 1040 False.

For the 2016 tax year, Robin Street Consultants received $540,000

from third parties for whom Defendant John Angelo and Sereno provided services. J&A Consultants reported $109,000 in gross receipts for the 2016 tax year. Defendant John Angelo reported $42,500 in total income on his 2016 Form 1040. A reasonable jury could find Sereno's testimony credible and determine that Defendant John Angelo did co-own Robin Street Consultants 50/50 and split the income. Therefore, a reasonable jury could determine that Defendant John Angelo did earn $270,000 from Robin Street Consultants in 2015 and reported only $109,000 on the J&A Consultants return and $54,800 on his personal return thereby making the 2016 Form 1040EZ False.

For the 2017 tax year, Robin Street Consultants received payment from third-parties for services provided by Defendant John Angelo and Sereno. The checks totaled $643,742. According to Sereno's testimony, Defendant John Angelo received half of these funds, or $321,871. J&A Consultants reported $168,200 in gross receipts for the 2017 tax year. Defendant John Angelo reported $77,100 in total income on his 2017 Form 1040. A reasonable jury could find Sereno's testimony credible and determine that Defendant John Angelo did co-own Robin Street Consultants 50/50 and split the income. Therefore, a reasonable jury could determine that Defendant John Angelo did earn at least $321,871 from Robin Street Consultants in 2017 and reported $168,200 on the J&A Consultants return

and only $77,100 on his personal return thereby making the 2017 Form 1040EZ False.

## **CONCLUSION**

The above are responses to the Court's questions for the government.

Date: May 22, 2024                Respectfully submitted,

STUART M. GOLDBERG
*Acting Deputy Assistant*
*Attorney General*
U.S. Department of Justice, Tax
Division

/s/Chris O'Donnell
Christopher P. O'Donnell (MA643949)
Mark McDonald (VA72198)
Trial Attorneys
600 Church Street
Flint, Michigan 48502-1280
(202) 305-2672

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2024, I electronically filed and emailed a copy of the foregoing document with the Clerk of the Court using the ECF system. The ECF system will automatically serve counsel of record.

<u>/s/ Chris O'Donnell</u>
Chris O'Donnell
Trial Attorney