STATE OF MICHIGAN
3RD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

Rachel Locricchio,

        Plaintiff,

v.

Warner Norcross + Judd,
a Michigan professional limited liability
partnership,

Brian P. Lennon,
individually, and

Scott R. Carvo,
individually,

        Defendants.

Case No. 25-      -NM

Hon.

Patrick J. Hurford (P82903)
Patrick Hurford PLLC
500 Griswold St. (Suite 2400)
Detroit, MI 48226
(313) 367-1200
e-mail: patrick@hurford.law

Richard L. Hurford (P9858)
RHDR PC
20902 Mack Ave. (Suite 215)
GPW, MI 48236
(313) 510-8175
e-mail: richard@hurfordresolution.com

*There are not any other civil actions, pending or resolved, arising out of the same transaction or occurrence as alleged in this complaint.  /s/ Patrick J. Hurford*

**COMPLAINT**

Plaintiff, Rachel Locricchio, by and through her attorneys, states as follows.

**Parties, jurisdiction, and venue**

1.     Plaintiff, Rachel Locricchio ("Locricchio"), is a resident of the City of Oak Park, County of Oakland, State of Michigan.

2.      Locricchio is a certified public accountant and was an employee of nonparty Rehmann, LLC ("Rehmann") from January 1, 2007 until she was involuntarily terminated on February 9, 2023.  At the time of her termination, Locricchio worked at Rehmann's Detroit office, located in Wayne County.  Prior to January 1, 2007, Locricchio had worked as a certified public accountant for Boyes Wright Pittman & Co. ("BWP") since November 2000.  BWP merged with Rehmann on January 1, 2007.  Accordingly, Locricchio's effective start date with Rehmann was November 2000.

3.      Defendant Warner Norcross + Judd ("Warner") is a law firm and domestic limited liability partnership, with its principal place of business in Grand Rapids, Michigan.  Warner has multiple offices throughout Michigan, including in Wayne County (Detroit).  At all times relevant, Warner provided certain legal services to Rehmann and Locricchio in Wayne County.

4.       Upon information and belief defendant Brian Lennon ("Lennon") is a resident of Naples, Florida.  Upon information and belief, during the relevant times Lennon was a resident of Naples, Florida or Grand Rapids, Michigan.  Lennon conducts business throughout Michigan, including in Wayne County.  At all relevant times, defendant Lennon was a partner of Warner and provided legal services to Rehmann and Locricchio in Wayne County.  Defendant Lennon is an attorney and licensed to practice law in Michigan and was represented as a criminal law expert to clients of defendant Warner.

5.      Defendant Scott Carvo ("Carvo") is a resident of, upon information and belief, Grand Rapids, Michigan and conducts business throughout Michigan, including in Wayne County.  Defendant Carvo is a partner at Warner and provided legal services to Rehmann and Locricchio in Wayne County.  Defendant Carvo is an attorney and licensed to practice law in Michigan.

6. At all relevant times, defendants Lennon and Carvo practiced law under the auspices of defendant Warner, which is responsible for the acts and omissions of defendants Lennon and Carvo under the principles of agency, vicarious liability, and *respondeat superior*.

7. On February 5, 2025, Locricchio, Lennon, Carvo, and Warner entered into a tolling agreement, whereby any time calculations for statute of limitations purposes would be tolled for a period of sixty days.

8. The amount in controversy is greater than $25,000, and the injuries occurred in significant part in Wayne County, Michigan.

### Allegations

9. Locricchio had an employment contract and business relationship with Rehmann to provide tax and accounting services to Rehmann's clients from November 2000 until Locricchio was terminated in February 2023. This business relationship provided significant economic and reputational benefits to Locricchio. This business relationship had a reasonable certainty of providing future economic and reputational benefit for Locricchio.

10. In fact, Locricchio received numerous accolades concerning the performance of her duties and was on track to become a partner at Rehmann.

11. As part of her employment duties, Locricchio was called upon to provide tax advice and accounting services to Rehmann's client, CM. Accordingly, Locricchio, at Rehmann's direction, became part of a team that provided tax and accounting services to CM from approximately September 2015 to January 2021.

12. Unbeknownst to Locricchio and, upon information and belief, unbeknownst to Rehmann, the United States Department of Justice initiated a federal grand jury investigation prior to December 2017 that was targeting CM for, among other things, tax evasion.

13.     In or about December 2017, a federal grand jury investigating the case in the Eastern District of Michigan issued a subpoena to Rehmann for records concerning CM's taxes and the advice CM received from Rehmann.

14.     In or about December 2017, Rehmann retained defendant Warner to represent and protect its interests in responding to the subpoena.  Defendant Warner assigned their criminal law experts, defendants Lennon and Carvo to the matter.

15.     Upon information and belief, defendants Lennon and Carvo had conversations with the federal prosecutors in charge of CM's investigation and potential prosecution.  During those conversations, federal prosecutors asked defendants Lennon and Carvo to identify potential fact witnesses at Rehmann concerning the services it provided to CM.

16.     Upon information and belief, defendants Lennon and Carvo identified Locricchio as a fact witness in early 2018 and informed federal prosecutors of Locricchio's identity.

17.     Defendants Lennon and Carvo also identified Locricchio to the federal prosecutors as the Rehmann employee most knowledgeable of Rehmann's records concerning CM.

18.     Beginning in December 2017, defendants Lennon and Carvo communicated frequently and directly with Locricchio to coordinate Rehmann's responses to the grand jury subpoena.  During this time, despite Locricchio's reservations, she was advised by the Defendants and Rehmann to continue providing services to CM until the relationship between Rehmann and CM ended in 2021.

19.     Locricchio worked with defendants Lennon and Carvo to identify and produce records responsive to the grand jury subpoena.  As part of this process, Locricchio scanned approximately 100 pages of handwritten notes from her office files and provided those records to

defendant Lennon for immediate production to the government in response to the subpoena served upon Rehmann.

20.     Despite the fact Locricchio was identified as a fact witness, defendants Lennon and Carvo made the decision to designate Locricchio as the custodian of records for certain productions in response to the subpoena.  As the custodian of certain records, defendants Lennon and Carvo asked Locricchio to attest to the accuracy and authenticity of the produced records, as well as the quality of the search for the records.

21.     Defendants Lennon and Carvo made multiple productions of Rehmann's records in response to the grand jury subpoena.  These productions included, among other things, e-mail communications between Locricchio, CM, and others.  In addition, at the request of the prosecutors and under the direction of the Defendants, Locricchio was asked to gather and produce documents outside of the subpoena for production to the government.

22.     Despite receiving approximately 100 pages of handwritten notes from Locricchio, the Defendants failed to produce those records in a timely manner.  In fact, the records were in the possession of the Defendants for approximately five years before they were produced to the government.  The failure to produce those records, when discovered by federal prosecutors, portrayed Locricchio in a false light and was imputed to Locricchio by federal prosecutors, as she was designated as a custodian of records by defendants Lennon and Carvo, who also attested to the quality of the responses submitted by defendants Lennon and Carvo.

23.     Because Locricchio was also identified as a fact witness, beginning in 2018, defendants Lennon and Carvo had meetings and conversations with Locricchio about Locricchio's factual knowledge concerning CM.

24.     Beginning in January 2018, Defendants Lennon and Carvo supervised informal conversations between Locricchio and the federal prosecutors targeting CM.  At some point in 2020, the federal prosecutors requested to conduct a formal witness interview of Locricchio about CM's interactions with Rehmann.  Defendants Lennon and Carvo scheduled Locricchio's first interview to occur telephonically in September 2020.

25.     Defendants Lennon and Carvo never provided any *Upjohn* warning to Locricchio. Defendants Lennon and Carvo never explained to Locricchio that the Defendants represented Rehmann and that Rehmann's interests and Locricchio's interests may not be aligned.  In fact, defendant Lennon specifically advised Locricchio there was no need for her to retain independent representation and, in fact, her interests would be protected by the Defendants.  By failing to provide any *Upjohn* warnings to Locricchio, the Defendants further underscored they were protecting and representing Locricchio's interests.  And in fact, Locricchio believed she was being represented by the Defendants.

26.      Defendants Lennon and Carvo never explained the implications to Locricchio of her being designated as the custodian of Rehmann's business records and the attestations that she was requested to acknowledge by defendants Lennon and Carvo.

27.     Defendants Lennon and Carvo never provided any guidance to Locricchio on her right and option to decline a government interview.

28.     Defendants Lennon and Carvo never explained to Locricchio that her interests may not be aligned with Rehmann's interests concerning the decision to be interviewed by the federal prosecutors.

29.     Defendants Lennon and Carvo never explained to Locricchio that, if Locricchio declined the government interview and received a grand jury subpoena for testimony, she could assert her Fifth Amendment right not to testify.

30.     Defendants Lennon and Carvo never explained to Locricchio that, if she received a subpoena to testify at trial, she could assert her Fifth Amendment right not to testify.

31.     On or about September 28, 2020, Locricchio traveled to the Defendants' office and met with defendant Lennon in a conference room.  During that time, federal prosecutors and FBI special agents interviewed Locricchio via telephone.

32.     Between September 2020 and February 2023, Locricchio was interviewed either in person or via videoconference on at least five occasions.  Defendant Lennon was present for each interview.  Defendant Carvo was present for certain interviews.

33.     The Defendants did not appropriately prepare Locricchio for the interviews.  The Defendants did not review the documents they produced to the government with Locricchio prior to the interviews.  No preparatory sessions were conducted with Locricchio to review documents produced to the government (including Locricchio's own e-mails or calendar entries).  No attempt was made to refresh Locricchio's recollection of events defendants Lennon and Carvo knew would be subjects of the interview.  In fact, Locricchio was advised not to look at any factual materials on her computer or tax returns Rehmann had completed for CM since 2015.  Locricchio was advised to simply rely on her memory.

34.     CM was indicted by the federal prosecutors in December 2020.  The federal prosecutors indicted CM in another case in April 2022.  The charges against CM included tax evasion.

35.     The initial government interviews of Locricchio started off with simple background questions and information about Rehmann's relationship with CM.  The interviews then began to focus on partnership taxation questions.  On this issue, the federal prosecutors started questioning the correctness of CM's tax returns under partnership taxation laws.

36.     The federal prosecutors began to take a hostile tone towards Locricchio after she answered partnership taxation questions correctly.  At one point during the interviews, federal prosecutors asked Locricchio if she was "being paid by CM" to give the answers she was giving.

37.     By January 2023, it was clear that CM was proceeding to trial in the first of his federal criminal cases.  At this time, Locricchio became aware that federal prosecutors intended to call her as a witness at CM's trial.

38.     On or about February 2, 2023, concerned about testifying at CM's trial, Locricchio informed defendant Lennon via telephone that, unrelated to the quality and correctness of CM's tax returns under review by the government, she had confidential and sensitive information to disclose.  Locricchio specifically asked defendant Lennon if she should get another attorney, and he responded "no."  Locricchio was advised by Defendant Lennon that her communications with him were confidential and protected by an attorney-client relationship.  Locricchio disclosed confidential, personal, and sensitive information to defendant Lennon concerning a past, personal relationship.

39.     Locricchio explained to defendant Lennon that this confidential, personal, and sensitive information had absolutely nothing to do with the accuracy and quality of the services performed for CM while a Rehmann employee.  Locricchio explained to defendant Lennon her desire that the confidential, personal, and sensitive information not become public.

40.     A tax expert's report that the Defendants failed to secure in a timely fashion established that the confidential, personal, and sensitive information did not adversely or otherwise impact the quality of Rehmann's work product.  According to this expert, there were no errors in Locricchio's or Rehmann's work product.

41.     Defendant Lennon advised Locricchio that he would handle the issue in a routine manner.  Defendant Lennon advised Locricchio to let defendant Lennon provide the information to federal prosecutors so they would be aware of it and then led Locricchio to believe that the government would file a motion at trial to prevent the confidential information from being revealed.

42.     Defendants Lennon and Carvo never explored the option of not disclosing the confidential, personal, and sensitive information to the government with Locricchio.  Defendants Lennon and Carvo did not analyze the likelihood of the government discovering the information without disclosing it.  Defendants Lennon and Carvo never discussed with Locricchio the risks of disclosing the confidential information to federal prosecutors.  Defendants Lennon and Carvo never discussed with Locricchio the potential adverse impact of such disclosure, particularly in light of the fact that the Defendants had negligently failed to provide approximately 100 pages of Locricchio's notes.

43.     Without reasonably informing Locricchio concerning disclosure, defendant Lennon disclosed the sensitive and confidential information to federal prosecutors on February 3, 2023.

44.     Between February 2 and 9, 2023, without Locricchio's consent or knowledge, defendants Lennon and Carvo disclosed the confidential information to Rehmann.  Upon information and belief, defendants Carvo and Lennon disclosed the confidential information to

cover up their own failures to timely produce Locricchio's handwritten notes and obtain an expert opinion concerning the quality of Locricchio's work on CM's tax returns.

45.     Upon information and belief, between February 2 and 9, 2023, defendants Warner, Lennon, and Carvo recommended Rehmann terminate Locricchio as a result of the wrongfully disclosed confidential information.

46.     On February 9, 2023, Rehmann terminated Locricchio as a result of the confidential information she provided to defendant Lennon.

47.     After receiving the confidential information, the federal prosecutors took an even more hostile tone towards Locricchio.  Because Locricchio was designated as a custodian of records, the government began to question the records' authenticity and whether Locricchio had tampered with them.  The federal prosecutors accused Locricchio of tampering with the records that the Defendants had directed Locricchio to gather in response to the prosecutors' request for records outside the scope of the subpoena.

48.     In addition, the government was told about the existence of Locricchio's notes, but never received them from defendant Warner in a timely manner.  Based on Warner's communications with federal prosecutors that they had provided all the Rehmann materials they received from Locricchio, the federal prosecutors accused Locricchio of hiding/destroying the documents and impeding a federal investigation.

49.     On May 17, 2023, Locricchio was indicted and charged with aiding and abetting CM to commit tax evasion.  Locricchio hired an attorney outside defendant Warner to represent and protect her interests in the criminal proceedings.  Incredibly, the Defendants continued to represent Rehmann for the duration of the government's investigation and prosecution.

50.     After Locricchio was indicted, defendant Warner belatedly discovered that they were, in fact, in possession of handwritten notes sent to them by Locricchio and finally produced them to the federal prosecutors.

51.     The issuance of an arrest warrant and the indictment of Locricchio was a direct and proximate result of the Defendants' malfeasance and malpractice.

52.     The federal charges against Locricchio and CM were ultimately dismissed with prejudice by the replacement attorney retained by Locricchio.

### Count 1 – Legal Malpractice

53.     Locricchio realleges and reaffirms each and every allegation set forth in paragraphs 1 through 52, above.

54.     Based on the Defendants' oral statements and course of conduct with Locricchio, an attorney-client relationship formed between the Defendants and Locricchio.

55.     As Locricchio's attorneys, the Defendants committed professional malpractice and breached their professional obligations to Locricchio to maintain client confidences and client loyalty.  The Defendants intentionally took actions and failed to take action that attorneys of ordinary learning, judgment and skill (let alone criminal law experts) in Wayne County would, including the following:

    a.  undertaking the representation of Locricchio notwithstanding conflicts of interest between Rehmann and Locricchio including, but not limited to, designating Locricchio as the record custodian;

    b.  continuing to represent Locricchio notwithstanding conflicts of interest between Rehmann and Locricchio;

c. failing to advise Locricchio concerning her option not to submit for an interview with federal prosecutors;

d. failing adequately prepare Locricchio for interviews with federal prosecutors;

e. failing to obtain an expert opinion as to whether Rehmann had correctly calculated CM's taxes;

f. failing to produce handwritten notes provided by Locricchio in response to the grand jury subpoena;

g. breaching the duty of client confidentiality by disclosing confidential information to federal prosecutors without providing sufficient advice for Locricchio to make an informed decision;

h. breaching the duty of client confidentiality by disclosing confidential information to Rehmann without Locricchio's knowledge or consent;

i. breaching the duty of client loyalty by recommending Rehmann terminate Locricchio's employment as a result of the confidential information; and

j. engaging in other acts of malpractice that may be ascertained during discovery in this matter.

56. As a direct and proximate cause of the Defendants' legal malpractice as set forth above, Locricchio has incurred irreparable harm in at least the following regards:

a. compensatory damages for loss of employment and resulting loss of income and other valuable economic benefits;

b. damage to Locricchio's professional reputation;

c. exemplary and mental injury damages for humiliation, outrage, and indignity;

d. extreme emotional distress, including pain and suffering; and

e. such other damages to be determined upon completion of investigation and discovery.

WHEREFORE, Locricchio requests the entry of judgment against the Defendants, jointly, in an amount in excess of $25,000 and an award of all compensatory, exemplary and mental injury damages, costs, and attorney fees.

### Count 2 – Tortious Interference with Business Relationship or Expectancy

57. Locricchio realleges and reaffirms each allegation set forth in paragraphs 1 to 56, above.

58. As set forth above, the Defendants committed malpractice in connection with its representation of Rehmann and Locricchio.

59. Between February 2, 2023 and February 9, 2023, upon information and belief, the Defendants withheld from Rehmann and/or misrepresented the nature and scope of the assistance Locricchio provided in producing Rehmann's records and information in response to the grand jury subpoena in a timely manner.

60. Between February 2, 2023 and February 9, 2023, the Defendants, in breach of their duty of confidentiality to Locricchio, improperly disclosed the confidential information to Rehmann without Locricchio's knowledge or consent.

61. Upon information and belief, the disclosure of the confidential information and the misrepresentations made by the Defendants was to hide their own misfeasance and malfeasance in its improper representation of both Locricchio and Rehmann.

62. Upon information and belief, to further hide its misfeasance and malfeasance, and to draw the attention of DOJ elsewhere, the Defendants intentionally interfered with Locricchio's business relationship with Rehmann by recommending her employment be terminated.

63.     In fact, at no time (including in dealing with federal prosecutors), did the Defendants seek to evaluate the propriety of the tax advice CM received from Rehmann.

64.     An expert tax opinion obtained by Locricchio's subsequent legal counsel establishes that the accounting and tax services rendered by Rehmann and Locricchio (as a Rehmann employee) to CM were exemplary.

65.     As a direct and proximate of the Defendant's intentional and improper actions to interfere with Locricchio's business relationship as set forth above, Locricchio has been irreparably harmed in at least the following regards:

a.   compensatory damages for loss of employment and resulting loss of income;

b.   pecuniary losses caused by lost business opportunities and other valuable economic benefits; and

c.   such other damages to be determined upon completion of investigation and discovery.

WHEREFORE, Locricchio requests the entry of judgment against the Defendants, jointly, in an amount in excess of $25,000 and an award of all compensatory damages, pecuniary losses, and attorney fees.

## Count 3 – Breach of Fiduciary Duty

66.     Locricchio realleges and reaffirms each allegation set forth in paragraphs 1 to 65, above.

67.     As Locricchio's attorneys, the Defendants were Locricchio fiduciaries. Accordingly, the Defendants' fiduciary duties to Locricchio included, but were not limited to, loyalty and confidentiality.  In addition, as fiduciaries, attorneys are required to act in their

client's best interests, avoid conflicts of interest, disclose any conflicts of interest, and maintain the trust placed in them.

68. As Locricchio's attorneys and fiduciaries, the Defendants breached their fiduciary duties to Locricchio to maintain confidences and act in Locricchio's best interests. The Defendants intentionally took the following actions that violated the fiduciary duties owed to Locricchio:

   a. undertaking the representation of Locricchio notwithstanding conflicts of interest between Rehmann and Locricchio including, but not limited to, designating Locricchio as the record custodian;

   b. continuing to represent Locricchio notwithstanding conflicts of interest between Rehmann and Locricchio;

   c. failing to produce handwritten notes provided by Locricchio in response to the grand jury subpoena;

   d. disclosing confidential information to Rehmann without Locricchio's knowledge or consent;

   e. recommending Rehmann terminate Locricchio's employment as a result of the confidential information; and

   f. engaging in other acts that may be ascertained during discovery in this matter.

69. As a direct and proximate of the Defendant's intentional and improper actions, which breached fiduciary duties owed to Locricchio, Locricchio has been irreparably harmed in at least the following regards:

   a. compensatory damages for loss of employment and resulting loss of income and other valuable economic benefits;

b.  damage to Locricchio's professional reputation;

c.  exemplary and mental injury damages for humiliation, outrage, and indignity;

d.  extreme emotional distress, including pain and suffering; and

e.  such other damages to be determined upon completion of investigation and discovery.

70.  In addition, Locricchio seeks disgorgement of any profits obtained by the Defendants from their representation of Rehman and Locricchio as the Defendants profited from breaching their fiduciary duties to Locricchio.  As the injured party, Locricchio is entitled to those profits.

WHEREFORE, Locricchio requests the entry of judgment against the Defendants, jointly, in an amount in excess of $25,000 and an award of all compensatory damages, exemplary and mental injury damages, disgorgement of profits, costs, and attorney fees.

Date:  April 4, 2025

Respectfully submitted,

/s/ Patrick J. Hurford
Patrick J. Hurford (P82903)
Patrick Hurford PLLC
500 Griswold St. (Suite 2400)
Detroit, MI 48226
(313) 367-1200
e-mail: patrick@hurford.law

/s/ Richard L. Hurford
Richard L. Hurford (P29858)
RHDR PC
20902 Mack Ave. (Suite 215)
GPW, MI 48236
(313) 510-8175
e-mail: richard@hurfordresolution.com